ACCEPTED
03-15-00025-CV
7016623
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/21/2015 2:13:08 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00025-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/21/2015 2:13:08 PM
JEFFREY D. KYLE
Clerk

_____

APPELLANTS, LAKEWAY REGIONAL MEDICAL CENTER, LLC AND
SURGICAL DEVELOPMENT PARTNERS, LLC// CROSS-APPELLANT,
LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS
SPECIALTY HOSPITAL, LLC

v.

APPELLEES, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE
TRAVIS SPECIALTY HOSPITAL, LLC// CROSS-APPELLEES, LAKEWAY
REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT
PARTNERS, LLC, BRENNAN, MANNA, & DIAMOND, LLC
AND FRANK T. SOSSI

_____

BRIEF OF CROSS-APPELLANT
LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A
LAKE TRAVIS SPECIALTY HOSPITAL, LLC ("LTT")

_____

Jane M.N. Webre
S. Abraham Kuczaj, III
Robyn B. Hargrove
**SCOTT DOUGLASS
    & MCCONNICO LLP**
303 Colorado Street, 24th Floor
Austin, TX  78701
(512) 495-6300
(512) 495-6399 Fax

COUNSEL FOR LTT

**ORAL ARGUMENT REQUESTED**

1226029

## IDENTITY OF PARTIES AND COUNSEL

<u>Defendants-Appellants/Cross-Appellees</u>
Lakeway Regional Medical Center, LLC
Surgical Development Partners, LLC

<u>Counsel for Defendants-Appellants/Cross-Appellees</u>
Jeff Cody
Barton Wayne Cox
Norton Rose Fulbright
2200 Ross Avenue, Suite 2800
Dallas, TX  75201-2784

Joy Soloway
Norton Rose Fulbright
1301 McKinney, Suite 5100
Houston, TX 77010-3095

<u>Additional Appellate Counsel for Surgical Development Partners, LLC</u>
Jessica Z. Barger
Raffi Melkonian
Wright &Close, LLP
One Riverway, Suite 2200
Houston, TX 77056

<u>Plaintiff-Cross-Appellant/Appellee</u>
Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC

<u>Counsel for Defendant-Cross-Appellant</u>
Jane M.N. Webre
S. Abraham Kuczaj III
Robyn B. Hargrove
Paige A. Amstutz
Steven J. Wingard
Scott Douglass & McConnico LLP
303 Colorado, Suite 2400
Austin, Texas  78701

ii

<u>Defendants-Appellees</u>
Brennan, Manna & Diamond, LLC
Frank T. Sossi

<u>Counsel for Defendants-Appellees</u>
Robert A. Bragalone
B. Ryan Fellman
Gordon & Rees LLP
2100 Ross Ave., Suite 2800
Dallas, TX 75201

1245899

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... ii

INDEX OF AUTHORITIES..................................................................... vii

STATEMENT OF THE CASE................................................................... xi

STATEMENT OF JURISDICTION............................................................ xii

RECORD........................................................................................... xii

APPENDIX ...................................................................................... xiii

ISSUES ON CROSS-APPEAL ............................................................... xiv

OVERVIEW ........................................................................................1

STATEMENT OF FACTS ........................................................................2

    A.    The Hospital Defendants receive LTT's confidential information subject to a confidentiality agreement for the purpose of evaluating a joint hospital project. ......................................2

    B.    Defendants use LTT's confidential information to secure lucrative hospital mortgage insurance from HUD, then abandon the LTT project.........................................................4

SUMMARY OF THE ARGUMENT ...........................................................7

ARGUMENT ......................................................................................7

    A.    Standard of review on summary judgment. ........................................7

    B.    There are significant material fact issues that preclude summary judgment on LTT's claim for misappropriation of trade secrets. .........9

        1.    LTT submitted evidence that its confidential information was a trade secret. ...................................................10

            a.    Texas law recognizes that trade secret status is generally a fact question. ...............................10

1245899

        b.      There is plenty of evidence of LTT's trade secrets. ........13

    2.     There is evidence that Defendants acquired LTT's trade secrets through breach of a confidential relationship or through improper means. ........................................................18

        a.      Confidential relationship ................................................18

        b.      Improper means ...........................................................20

    3.     There is evidence that Defendants disclosed or used LTT's trade secrets without authorization. ..............................22

        a.      Defendants "used" the trade secrets. ..............................22

        b.      Defendants "disclosed" the trade secrets. ........................26

    4.     There is evidence of damages as a result of the misappropriation. ....................................................................27

        a.      Loss of market value .....................................................28

        b.      Reasonable royalty damages ...........................................29

        c.      Benefits obtained ..........................................................30

        d.      No HUD reliance necessary ...........................................31

C.    Summary judgment was improper as to Section 2 of the LOI. ...........32

    1.     Section 2 of the LOI is a binding agreement. ...........................32

        a.      The detailed provisions are more than an agreement to agree. ....................................................32

        b.      The parties intended for all provisions of the LOI to be binding. .............................................................35

        c.      Section 2 contains all essential terms. ............................36

    2.     The Hospital Defendants cannot rely on unsatisfied conditions precedent to avoid complying with Section 2 because their own conduct prevented performance. .................38

v

D.    The trial court abused its discretion in sustaining objections to some of LTT's summary judgment evidence.......................................41

        1.    The court improperly sustained objections that had become moot. ..........................................................................42

        2.    LTT adequately cited to the entirety of the Project File. ..........45

        3.    The court erred in sustaining an objection to *argument* that the Project File as a whole is a trade secret. ......................46

        4.    Berry's testimony about the Project File was proper................48

CONCLUSION AND PRAYER ............................................................................51

CERTIFICATE OF SERVICE ..............................................................................53

CERTIFICATE OF COMPLIANCE......................................................................53

APPENDIX............................................................................................................54

1245899

# INDEX OF AUTHORITIES

**Cases**

*Bastrop Cent. Appraisal Dist. v. Acme Brick Co.*,
  428 S.W.3d 911 (Tex. App.—Austin 2014, no pet.)......................................8

*Bertolli v. C.E. Sheperd Co.*,
  752 S.W.2d 648 (Tex. App.—Houston [14th Dist.] 1998, no writ).............12

*Bishop v. Miller*,
  412 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ...... passim

*Bohnsack v. Varco, L.P.*,
  668 F.3d 262 (5th Cir. 2012) ........................................................................30

*Bracey v. City of Killeen*,
  417 S.W.3d 94 (Tex. App.—Austin 2013, no pet.)....................................7, 8

*CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*,
  809 S.W.2d 577 (Tex. App.—Dallas 1991, writ denied).............................33

*Clear Lake City Water Auth. v. Friendswood Dev. Co., Ltd.*,
  344 S.W.3d 514 (Tex. App.—Houston [14th Dist.] 2011,
  pet. denied) ................................................................................. 39, 41

*Cudd Pressure Control, Inc. v. Roles*,
  328 Fed.Appx. 961 (5th Cir. 2009) ...................................................... passim

*Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*,
  710 F.3d 579 (5th Cir. 2013) ........................................................................19

*DTM Research, LLC v. AT&T Corp.*,
  245 F.3d 327 (4th Cir. 2001) ........................................................................49

*Foreca, S.A. v. GRD Dev. Co.*,
  758 S.W.2d 744 (Tex. 1988) .........................................................................36

*Fuqua v. Fuqua*,
  750 S.W.2d 238 (Tex. App.—Dallas 1988, writ denied).............................38

1245899

*Geophysical Micro Computer Applications (Int'l) Ltd. v. Paradigm Geophysical Ltd.*,
No. 05-98-02016, 2001 WL 1270795 (Tex. App.—Dallas
Oct. 24, 2001, pet. denied)..............................................................................37

*Georgia–Pacific Corp. v. United States Plywood Corp.*,
318 F.Supp. 1116 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295
(2d Cir. 1971)..................................................................................................30

*Gonzales v. Zamora*,
791 S.W.2d 258 (Tex. App.—Corpus Christi 1990, no writ) ........................12

*H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*,
951 S.W.2d 33 (Tex. App.–Corpus Christi 1997, pet. denied) .....................19

*Haggar Clothing Co. v. Hernandez*,
164 S.W.3d 386 (Tex. 2005) ...........................................................................8

*Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*,
106 S.W.3d 380 (Tex. App.—Austin 2003, no pet.)......................................46

*Hyde Corp. v. Huffines*,
314 S.W.2d 763 (Tex. 1958) .............................................................................9

*II Deerfield Limited Ltd. P'ship v. Henry Bldg., Inc.*,
41 S.W.3d 259 (Tex. App.—San Antonio 2001, pet. denied) ............... 38, 41

*In re Bass,*
113 S.W.3d 735 (Tex. 2003) ............................................................. 11, 18

*In re Cayman Island Firm of Deloitte & Touche,*
No. 04-01-00491-cv, 2001 WL 1042233 (Tex. App.—San Antonio
Sept. 12, 2001, no pet.)...................................................................................49

*Investment Retrievers, Inc. v. Fisher*,
No. 03-13-00510-CV, 2015 WL 3918503 (Tex. App.—Austin
June 25, 2015, no pet.)....................................................................................42

*Johnson v. Brewer & Pritchard, P.C.*,
73 S.W.3d 193 (Tex. 2002) ...............................................................................9

*Jones v. Ray Ins. Agency*,
  59 S.W.3d 739 (Tex. App.—Corpus Christi 2001, pet. denied) ...................42

*Karns v. Jalapeno Tree Holdings, LLC*,
  459 S.W.3d 683 (Tex. App.—El Paso 2015, pet. denied)...................... 34, 35

*King Ranch, Inc. v. Chapman*,
  118 S.W.3d 742 (Tex. 2003) ......................................................................8

*Krainz v. Kodiak Resources*, Inc.,
  436 S.W.3d 325 (Tex. App.—Austin 2013, pet. denied)............................44

*Lamont v. Vaquillas Energy Lopeno Ltd., LLP*,
  421 S.W.3d 198 (Tex. App.—San Antonio 2013, pet. denied) ....... 20, 25, 27

*Loy v. Harter*,
  128 S.W.3d 397 (Tex. App.—Texarkana 2004, pet. denied).......................44

*McCalla v. Baker's Campground, Inc.*,
  416 S.W.3d 416 (Tex. 2013) ............................................................... 34, 38

*McCulley Fine Arts Gallery, Inc. v. "X" Partners*,
  860 S.W.2d 473 (Tex. App.—El Paso 1993, no writ)........................... 37, 38

*Metallurgical Indus., Inc. v. Fourtek, Inc.*,
  790 F.2d 1195 (5th Cir. 1986) ..................................................................12

*Nguyen v. Citibank N.A.*,
  403 S.W.3d 927 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) .......51

*Oryon Technologies, Inc. v. Marcus*,
  429 S.W.3d 762 (Tex. App.—Dallas 2014, no pet.) ..................................49

*Phillips v. SACHEM, Inc.*,
  03-13-00346-CV, 2014 WL 7464035 (Tex. App.—Austin
  Dec. 31, 2014, no pet.)................................................................................8

*Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*,
  337 S.W.3d 846 (Tex. 2011) .....................................................................29

*Scott v. Ingle Bros. Pac., Inc.*,
  489 S.W.2d 554 (Tex. 1972) ......................................................................37

ix

*Sharifi v. Steen Automotive, LLC*,
 370 S.W.3d 126 (Tex. App.—Dallas 2012, no pet.) .............................. 39, 41

*Southwestern Energy Prod. Co. v. Berry-Helfand*,
 411 S.W.3d 581 (Tex. App.–Tyler 2013, pet. granted)......................... passim

*Taco Cabana, Int'l v. Two Pesos, Inc.*,
 932 F.2d 1113 (5th Cir. 1991) ......................................................................12

*Tewari De-Ox Systems, Inc. LLP v. Mountain States/Rosen, LLC*,
 637 F.3d 604 (5th Cir. 2011) .......................................................................12

*Tex. Integrated Conveyor Sys., Inc. v. Innovative Concepts, Inc.*,
 300 S.W.3d 348 (Tex. App.—Dallas 2009, pet. denied) .........................9, 18

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
 504 F.2d 518 (5th Cir. 1974) ................................................................. 27, 29

*Wellogix, Inc. v. Accenture, LLP*,
 716 F.3d 867 (5th Cir. 2013) .......................................................................12

*West Beach Marina, Ltd. v. Erdeljac*,
 94 S.W.3d 248 (Tex. App.—Austin 2002, no pet.).......................................36

*Woodhaven Ptnrs, Ltd. v. Shamoun & Norman, LLP*,
 422 S.W.3d 821 (Tex. App.—Dallas 2014, no pet.) .............................. 41, 50

**Statutes**

12 U.S.C. § 1715z-7(a) .......................................................................4, 31

24 C.F.R. § 242.16 ..............................................................................4, 31

Tex. Gov't Code § 22.220.......................................................................... xii

1245899

STATEMENT OF THE CASE

*Nature of the Case:* This case involves claims for breach of contract and misappropriation of trade secrets between two hospital projects in Lakeway, Texas. Lake Travis Transitional LTCH, LLC ("LTT") sued Lakeway Regional Medical Center, LLC ("LRMC") and Surgical Development Partners, LLC ("SDP") (together, the "Hospital Defendants"), as well as certain Lawyer Defendants involved in the transaction, for improperly taking LTT's confidential information obtained pursuant to a binding Letter of Intent and using it to secure a government-backed mortgage that allowed them to build a competing hospital. The Letter of Intent had contemplated that LTT and Defendants would work together on the LTT project, and did not permit the use of LTT's information for any other purpose. The Letter of Intent is attached at App. 1.

*Trial Court:* 343rd District Court of Travis County, Texas. Hon. Steven Yelenosky rendered a pretrial partial summary judgment. Hon. Lora Livingston presided over the subsequent jury trial and rendered the final judgment.

*Course of Proceedings:* Judge Yelenosky rendered partial summary judgment as to (1) LTT's claims against all Defendants for misappropriation of trade secrets; and (2) LTT's claim that the Hospital Defendants breached section 2 of the Letter of Intent. App. 2, 3. Judge Yelenosky also sustained the Hospital Defendants' (but not the Lawyer Defendants') objections to some of LTT's summary judgment evidence. App. 4.

LTT's remaining claims against the Hospital Defendants were tried to a jury, which found that the Hospital Defendants breached the Letter of Intent. App. 5. Judge Livingston rendered judgment on the jury's verdict against the Hospital Defendants for $7.9 million in actual damages, together with $2 million in attorneys' fees, pre- and post- judgment interest, and costs of court. App. 6.

1245899

LTT filed a notice of appeal. 6/18CR6-8. LTT's cross-appeal is limited to the rulings on partial summary judgment that Judge Yelenosky made before trial. App. 2, 3, 4.


## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from a final judgment of a district court pursuant to Texas Government Code § 22.220.


## RECORD

The record on appeal includes a 3-volume Clerk's Record and four 1-volume supplemental Clerk's Records, only one of which is labeled "supplemental." Citations to the 3-volume Clerk's Record will be to volume and page: ___CR___. Citations to the one-volume Clerk's Records will be to date and page: 5/21CR___, 6/18CR___, 7/17CR___, or 7/21CR___.

There is a 20-volume Reporter's Record, a 1-volume supplemental Reporter's Record, and a 1-volume Reporter's Record that is not labeled "supplemental." Volume 1 of the 20-volume Reporter's Record is a Master Index. Volumes 2 and 3 are pretrial hearings held on 2/4/14 and 7/2/14, respectively. Volumes 4 through 15 include the jury trial. Volumes 16 and 17 include the exhibits from the 2/4/14 pretrial hearing. Volumes 18 through 20 include the trial exhibits. The Supplemental Reporter's Record includes additional trial exhibits. The 1-volume Reporter's Record (filed 1/22/15) is the same 7/2/14 hearing transcript as Volume 3 of the 20-volume Reporter's Record.

Citations to the Reporter's Record will be to volume and page number: ___RR___. Citations to trial exhibits will be to party and exhibit number: PX___, DX___.

1245899

## APPENDIX

The following items are included in the Appendix to this brief:

App. 1:    Letter of Intent (PX2; 2CR7623-29)

App. 2:    Order on summary judgment as to the Lawyer Defendants (7/17CR201-02)

App. 3:    Order on summary judgement as to the Hospital Defendants (3CR12266-67)

App. 4:    Order on the Hospital Defendants' objections to LTT's summary judgement evidence (3CR12261)

App. 5:    Charge of the Court (3CR12997-13009)

App. 6:    Judgment (6/18CR3-5)

App. 7:    Declaration of Robert Berry, without exhibits (2CR7604-7617)

App. 8:    Confidentiality Agreement (2CR7619-21)

1245899

## ISSUES ON CROSS-APPEAL

1.     Did the trial court err in granting summary judgment as to LTT's claims for misappropriation of trade secrets?

2.     Did the trial court err in granting summary judgment as to LTT's claim against the Hospital Defendants for breach of section 2 of the Letter of Intent?

3.     Did the trial court abuse its discretion in excluding some of LTT's summary judgment evidence?

1245899

LTT files this Brief of Cross-Appellant addressing the trial court's orders on partial summary judgment.

<u>OVERVIEW</u>

This cross-appeal presents a simple, plain-vanilla question: did LTT adduce sufficient evidence to raise a fact issue and avoid summary judgment on its claims for misappropriation of trade secrets and breach of section 2 of the LOI? The summary judgment rulings, particularly regarding the claim for misappropriation of trade secrets, are wholly based on the evidence and do not turn on legal issues. And the evidence supporting LTT's claims is substantial. The summary judgment record includes evidence that LTT's confidential information is a trade secret, and that LTT developed it at substantial cost and takes measures to ensure that it is kept confidential. The record includes evidence that Defendants were given access to the confidential information subject to confidentiality agreements for the purpose of acquiring LTT's hospital facility, but Defendants instead used the information to secure a government-backed mortgage to develop their own competing hospital and then abandoned the LTT project. There is substantial evidence supporting each element of a claim for misappropriation of trade secrets, more than enough to raise a fact question and overcome Defendants' traditional and no-evidence motions for summary judgment. This Court should give the evidence its due regard and reverse the summary judgments.

1

A.  The Hospital Defendants receive LTT's confidential information subject to a confidentiality agreement for the purpose of evaluating a joint hospital project.

In 2009, LTT was developing Lake Travis Specialty Hospital ("Lake Travis Hospital") in the Lakeway area.  Lake Travis Hospital would compete directly with a larger hospital—called Lakeway Regional—that the Hospital Defendants hoped to develop nearby.  During this time, the Hospital Defendants were represented by Frank Sossi and his law firm, Brennan, Manna & Diamond, LLC (together, the "Lawyer Defendants").  Sossi also co-founded SDP, served on SDP's board of managers, was an officer of SDP, and served as general counsel for SDP while also serving as an officer and general counsel for LRMC.  2CR7743-52.

In April 2009, Defendants approached LTT about acquiring Lake Travis Hospital to serve as Lakeway Regional's initial campus.  App. 7 ¶ 2.  At the time, Lake Travis Hospital had a big head start on construction: it was almost 80% complete, while Lakeway Regional "was still just a lot."  *Id*.  The parties anticipated Lake Travis Hospital would be completed up to two years before Lakeway Regional.

When initially approached by Defendants, LTT's principals were reluctant to share any information about their plans with a competing hospital less than a half-mile away.  App. 7.  ¶2.  To facilitate the discussion of a possible acquisition,

2

SDP executed a Confidentiality Agreement with LTT on May 11, 2009. App. 8. The Confidentiality Agreement recited that "SDP has an interest in a potential development…opportunity as presented by LTT and will have access to certain Confidential Information regarding these opportunities," so "SDP and LTT desire to memorialize their understandings regarding SDP's disclosure and use of Confidential Information." App. 8 at 1. The Confidentiality Agreement defined "Confidential Information" to mean "all information concerning the Project and LTT's business." App. 8 ¶1. SDP agreed to "use Confidential Information only for informational purposes to evaluate the participation in the Project….Both parties agree that…neither it nor its employees, agents, or business or professional associates will disclose or use any Confidential Information in any manner whatsoever." App. 8 ¶2.

After some information was exchanged pursuant to the Confidentiality Agreement, in September 2009, the parties executed a Letter of Intent ("LOI"). App. 1; App. 7 ¶¶4-5. Like the Confidentiality Agreement, the LOI confirmed that the sole purpose for providing LTT's proprietary information was for Defendants to evaluate the hospital project. LOI §9.2. Pursuant to the LOI, and subject to its confidentiality provisions, LTT's confidential, proprietary and trade secret information was provided to Defendants through March 2010. App. 7 ¶5.

3

B. **Defendants use LTT's confidential information to secure lucrative hospital mortgage insurance from HUD, then abandon the LTT project.**

Unbeknownst to LTT, weeks after executing the Confidentiality Agreement, Defendants met with officials at HUD in Washington, D.C. to discuss obtaining Section 242 hospital mortgage insurance for LRMC. Section 242 insurance is only available for hospitals in areas that are underserved. *See* 12 U.S.C. § 1715z-7(a); *see also* 24 C.F.R. § 242.16 (allowing HUD hospital mortgage insurance only where competing capacity and services "are clearly not adequate to meet the needs of the population in the service area."). This requirement is important to help the federal government avoid risking taxpayer dollars to improperly influence competition where, as in the case of LRMC, HUD is asked to insure a $166.9 million mortgage for a *for-profit* hospital.

In March 2010, Defendants terminated negotiations with LTT, making the deal—as Defendants described it—"effectively dead." *See* 1CR208. Defendants nevertheless continued to use LTT's confidential information in order to nail down the HUD guarantee when, soon after HUD's preliminary approval of the guaranty for LRMC was announced, others began to question whether the needs of the Lakeway area justified a taxpayer-sponsored Section 242 guaranty. On May 8, 2010, the CEO of an unrelated hospital wrote to HUD and informed it that LTT's Lake Travis Hospital was nearing completion only a half-mile away from Lakeway Regional, and that "[t]his area is clearly NOT underserved." 2CR8015-19

4

1245899

(emphasis in original). That prompted HUD to contact LRMC's lender to determine whether LTT's Lake Travis Hospital was in fact a competitive facility. 2CR8026. To convince HUD that it was not, and thereby secure the pending $166.9 million mortgage, the Lawyer Defendants, on behalf of the Hospital Defendants, emailed HUD on May 10, 2010 ("May 10th Email").[1] 2CR8024-25.

In the May 10th Email, Sossi used the LTT confidential information and made the following representations to HUD about LTT's Lake Travis Hospital:

- "[t]he structure is very small and has numerous code issues related to the construction and design;"

- "any conversion from what was essentially a residential facility to a true acute care will cost a great deal of money;" and

- **"**[o]ur issue with the facility was the ability to work out all the design issues, the need for major retro fits to get it to open, the lack of physician interest for the facility, the zoning issues to allow the conversion to acute care status and what to do with the facility when LRMC opens. … [t]he costs and technical problems of conversion

---

[1] After receiving HUD's questions about LTT's Lake Travis Hospital, LRMC's lender forwarded them to Sossi and SDP's CEO Eddie Alexander. 2CR8026. Defendants do not dispute that Sossi's May 10th Email to HUD was sent on behalf of LRMC. 2CR6032, 5614, 5254-55. Sossi also copied SDP CEO Eddie Alexander and LRMC CMO Sam Demaio on the May 10th Email. 2CR8024. Sossi's simultaneous roles at SDP and LRMC, his inclusion of both LRMC and SDP principals in the communication, and his admission that other correspondence with HUD was sent on behalf of both SDP and LRMC, raise a reasonable inference that the May 10th Email was sent on behalf of SDP as well as LRMC. *Id*. at 8024; *see also* 2CR8061-65.

1245899

made the facility inappropriate to help LRMC or to be able to succeed as a separate facility."

2CR8024-25.

The next day, HUD responded to the inquiring hospital CEO, repeating what HUD internally considered "Mr. Sossi's facts" from the May 10th Email and stating that HUD did not believe the LTT facility was truly a competitor hospital because it could not meet "general acute licensing standards without expensive redesign/reconstruction and will not achieve general acute care zoning because of site limitations." 2CR8021-22. Ten days later, HUD agreed to go forward on the loan insurance and issue the amendments Defendants had requested to their loan insurance commitment. 2CR8482-83. The next day, the LRMC hospital mortgage loan closed and funded. 2CR7729.

Defendants' use of LTT's confidential information continued. For example, Sossi sent a letter to HUD about the LTT facility to convince HUD to defend its decision to insure LRMC's mortgage. 2CR8108-11. Defendants again represented to HUD alleged code compliance issues Defendants developed after acquiring LTT's confidential information: "the [LTT] facility requires numerous upgrades and modification to meet Texas licensing standards for providing true acute care services…" *Id.* They reiterated the alleged cost of conversion issues Defendants calculated after acquiring LTT's information in confidence. *Id.* They also

6

reminded HUD that "[t]he existence of the plans for [the LTT facility] were discussed in detail with the HUD Client Service team." *Id.* As a result, HUD emailed Sossi, saying "be assured that HUD intends to defend the decision to issue a loan guarantee for the LRMC project…" 2CR8042.

## SUMMARY OF THE ARGUMENT

This court should reverse the partial summary judgment as to LTT's claims for misappropriation of trade secrets. There is substantial summary judgment evidence of LTT's trade secrets, that Defendants acquired LTT's trade secrets pursuant to various confidentiality agreements for the express purposes of acquiring LTT's Lake Travis Hospital, that Defendants used that trade secret information instead for their own benefit to secure the lucrative HUD federal mortgage insurance and build a competing hospital, and that LTT suffered damages as a result.

Summary judgment was also improper as to LTT's claims for breach of section 2 of the LOI. That provision contains all of the necessary elements of an enforceable contract and is not an agreement to agree.

## ARGUMENT

A.    Standard of review on summary judgment.

An order granting summary judgment is reviewed de novo. *Bracey v. City of Killeen*, 417 S.W.3d 94, 103 (Tex. App.—Austin 2013, no pet.). Summary judgment is proper when there are no disputed issues of material fact and the

7

movant is entitled to judgment as a matter of law. *Id.* Because LTT was the non-movant, this Court must take as true all evidence favorable to LTT, and must indulge every reasonable inference and resolve every doubt in LTT's favor. *Bastrop Cent. Appraisal Dist. v. Acme Brick Co.*, 428 S.W.3d 911, 915 (Tex. App.—Austin 2014, no pet.).

Defendants moved for both traditional and no-evidence summary judgment. A no-evidence summary judgment is proper "when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Phillips v. SACHEM, Inc.*, 03-13-00346-CV, 2014 WL 7464035, at \*2 (Tex. App.—Austin Dec. 31, 2014, no pet.) (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003)). A no-evidence summary judgment is improper "if the nonmovant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact." *Id.* More than a scintilla of evidence exists where the evidence, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005).

8

B.     There are significant material fact issues that preclude summary judgment on LTT's claim for misappropriation of trade secrets.

The elements of a claim for misappropriation of trade secrets are: (1) the trade secret existed; (2) the trade secret was acquired through a confidential relationship or discovered by improper means; (3) the defendant disclosed or used the trade secret without authorization; and (4) damages. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Concepts, Inc.*, 300 S.W.3d 348, 366-67 (Tex. App.—Dallas 2009, pet. denied); *see also Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769-70 (Tex. 1958) ("One who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him.").

The Hospital Defendants and Lawyer Defendants moved for traditional and no-evidence summary judgment as to LTT's misappropriation of trade secrets claim on essentially the same three grounds: (1) they did not disclose LTT's trade secrets; (2) they did not misuse LTT's secrets; and (3) LTT did not sustain injury from improper use of its trade secrets.[2]   2CR5625-31 (LRMC); 2CR6045-52

---

[2] The Hospital Defendants' motions create an odd wrinkle.  They combine LTT's claim for misappropriation of trade secrets with its claim for breach of contractual confidentiality provisions into something the Hospital Defendants refer to as the "Proprietary Information Claim," thereby unilaterally conflating separate causes of action into a new hybrid "claim" that they then attack on summary judgment.  2CR5615, 6033; *see Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002) (court cannot grant summary judgment on grounds not presented in the motion).  While not the model of clarity, the Hospital Defendants appear to seek

9

1245899

(SDP); 2CR5248-49, 54-59 (Lawyer Defendants). The Lawyer Defendants also alleged that there is no evidence that "any of Plaintiff's purported trade secrets are trade secrets" or that they "acquired Plaintiff's trade secrets." 2CR5249.

Judge Yelenosky granted summary judgment as to LTT's claim for misappropriation of trade secrets. App. 2, 3. That was error, because the summary judgment evidence—outlined above—raises genuine issues of material fact that preclude summary judgment.

1.    LTT submitted evidence that its confidential information was a trade secret.

The critical threshold question is whether LTT brought forward some evidence that its confidential information is a trade secret. There was plenty of evidence.[3]

a.    Texas law recognizes that trade secret status is generally a fact question.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage

---

no-evidence summary judgment on the hybrid "Proprietary Information Claim" by alleging that there is "no evidence to support disclosure, use, or causation" in respect to LTT's "Protected Information" (which the Hospital Defendants define as "Proprietary Information or trade secrets."). 2CR5625-31, 6046-52. The trial court denied summary judgment as to the Hospital Defendants' breaches of contractual confidentiality obligations comprising the remainder of the hybrid "Proprietary Information Claim." 3CR12252 (Yelenosky letter explaining that "defendants conflate two distinct claims" regarding confidentiality); App. 3.

[3] Judge Yelenosky sustained some of the Hospital Defendants' objections to LTT's summary judgment evidence. App. 4. As is discussed more fully below in section D of the Argument, that ruling was in error, so the evidence should be fully considered in support of LTT's summary judgment response. Even without the disputed evidence, summary judgment was improper.

1245899

over competitors who do not know or use it." *In re Bass,* 113 S.W.3d 735, 739 (Tex. 2003). Courts look at the following factors to determine whether information constitutes a trade secret: "(1) the extent to which the information is known outside the claimant's business; (2) the extent to which the information is known by employees and others involved in the claimant's business; (3) the extent of the measures taken by the claimant to guard the secrecy of the information; (4) the value of the information to the claimant and to its competitors; (5) the amount of effort or money expended by the claimant in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *In re Bass,* 113 S.W.3d at 739. Recognizing that trade secrets do not fit neatly into each factor every time, the Court held that the party claiming a trade secret need not satisfy all six factors. *Id.* at 740.

Under Texas law, a compilation of distinct information may be protected as a trade secret, even if some of the components of that compilation are not, individually, confidential. *See Bishop v. Miller*, 412 S.W.3d 758, 767 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("[T]he fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.") (quoting Restatement (Third) of Unfair Competition § 39 cmt. f). In addition, the fact that some aspects of a trade secret may be publicly available does not preclude

11

the existence of a trade secret, since a "trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret." *Southwestern Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 597 (Tex. App.–Tyler 2013, pet. granted); *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1202 (5th Cir. 1986). Consequently, courts have found that a wide array of information may qualify as a trade secret. *See, e.g., Taco Cabana, Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991) (architectural drawings); *Southwestern Energy*, 411 S.W.3d at 597-98 (compilation and analysis of technical information); *Metallurgical Indus.*, 790 F.2d at 1203 (know how); *Gonzales v. Zamora*, 791 S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ) (business methods); *Bertolli v. C.E. Sheperd Co.,* 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1998, no writ) (market information); *Cudd Pressure Control, Inc. v. Roles*, 328 Fed.Appx. 961, 965 (5th Cir. 2009) (financial information).

Given the breadth of information that can be a trade secret, it is not surprising that the "existence of a trade secret is properly considered a question of fact to be decided by the judge or jury as fact-finder." *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 875 (5th Cir. 2013); *see also Tewari De-Ox Systems, Inc. LLP v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011) ("[W]hether

12

1245899

certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of the evidence from each side.'").

> b.      There is plenty of evidence of LTT's trade secrets.

The summary judgment record includes substantial evidence of the existence of LTT's trade secrets.  In its response to Defendants' motions, LTT included (among other things) the Project File, which is a compilation of all the documentary evidence reflecting LTT's trade secrets and proprietary information.[4] In addition, the summary judgment record includes a detailed declaration from LTT's Chief Executive Officer and Managing Member, Robert Berry, which establishes that the materials contained in the Project File constitute LTT's trade secrets.  App. 7 ¶¶5-8.  The Berry Declaration demonstrates that the trade secrets included in that compilation were "provided to Defendants during the course of the project review," pursuant to either the Confidentiality Agreement or the LOI with its additional confidentiality provisions.  *Id.* at ¶¶4-5.

The Berry Declaration identifies the Project File by bates numbers and explains the categories of documents contained within it as including, among other things, "a deal subfile; correspondence; contracts; drawings and specifications;

---

[4] The Project File was Exhibit 33 in LTT's combined summary judgment Appendix, and it includes subparts 33-A through 33-F.  2CR7598-7600.  The Project File is out of order in the Clerk's Record.  The subparts appear in the Clerk's Record at: Ex. 33-A (3CR8678-8810); Ex. 33-B (3CR8811-54); Ex. 33-C (3CR8855-9020); Ex. 33-D (3CR9021-9269); Ex. 33-E (3CR9272-9298, 9708-10320); Ex. 33-F (3CR8581-8669).

13

financial information and business plans; and other miscellaneous information pertaining to the Project." App. 7 ¶6. Berry further identified the trade secret information in the Project File compilation as including "architectural plans; program design and operations; financial information; hospital organization; mission; staff recruitment and retention; physician support; sources and uses of funds and other 'cost based' information; preliminary financial feasibility and other information about projected revenues and costs for the initial operation of Lake Travis Hospital; current state of construction; and preliminary financial feasibility ratios and other information about projected key operational ratios of Lake Travis Hospital." *Id.*, ¶7. Based on those documents, Berry stated that the compilation "contains information that LTT used in its business that provided LTT with an advantage over competitors who did not know or use it." *Id.* ¶7.

LTT not only filed the Project File and Berry Declaration; its summary judgment responses also identified specific examples of trade secrets from within the compilation that were provided to, and misappropriated by, Defendants:

> The evidence shows this information was used by Defendants in their improper disclosures to HUD. For example, and without limitation, during the project review, LTT provided Defendants with confidential, proprietary, and trade secret information regarding MEP specifications (Ex. 33 at LTT008217-8393), architectural specifications (*Id.* at LTT008666-9088), architectural drawings (*Id.* at LTT008464-8521, LTT008541-8634 & LTT008652-8665), site inspection (*Id.* at LTT008032-8033), meetings with staff and contractors (*Id.* at LTT007911-7913), response to PSP issues (*Id.* at LTT009872-9885), and plat (*Id.* at LTT009100). Utilizing that

14

information, Defendants internally drew conclusions about potential conversion costs: PSP plan of action (*Id.* at LTT008033); PSP Report and Drawings re: necessary changes (*Id.* at LTT009831-9854); and estimated costs for conversion (*Id.* at LTT009800-9806). Defendants then used that information in their improper May 10, 2010 use and disclosure to HUD regarding their view of conversion costs. Defendants also utilized the information identified above to internally draw conclusions about code compliance in their PSP Report and Drawings re: necessary changes (*Id.* at LTT009831-9854), and then used that information in their improper May 10, 2010 use and disclosure to HUD regarding their view of alleged code compliance issues (Ex. 12). Each of the documents above is contained in the Project File (Ex. 33) and is identified by Bates number for ease of reference.

*See, e.g.*, 3CR11919-20.

As part of the confidential project review, LTT also provided its trade secrets to Defendants in other ways, during on-site inspections and meetings. App. 7 ¶5; 3CR8836-37 (e-mail correspondence regarding site inspections); 3CR8714-16 (e-mail correspondence reflecting meetings with staff and contractors).

The Berry Declaration confirms that LTT's trade secrets were not generally known or readily available to the public. App. 7 ¶8. They were valuable to LTT, which spent a great deal of time, energy, and money developing the information. *Id.* at ¶11. For example, Berry and LTT's other principal, Keith McDonald, spent 12,000 hours over six years and more than $2,650,000 in the development of LTT. *Id.* Berry explained that LTT's trade secrets developed as part of that process "would be extremely difficult to duplicate, if possible at all." *Id.*

15

LTT also took steps to protect the confidential nature of its trade secrets. App. 7 at ¶¶8 & 10. Internally, LTT limited employee access to the information. *Id.* at ¶10. Regarding outside parties, it was LTT's practice to require those seeking access to LTT's trade secrets to agree to keep the information confidential. *Id.* at ¶8. The Defendants agreed through the Confidentiality Agreement and the LOI to maintain the confidentiality of LTT's trade secrets and other information provided during the project review.[5] 2CR7619-21; LOI §9. In addition, LTT secured confidentiality agreements from the other parties involved in the financing, development, and construction of LTT's facility, including LTT's landlord, architect, and general contractor. App. 7 ¶8; 2CR7653-54, 7656-59. The parties understood that the information exchanged during the review process was to be kept confidential. For example, a representative of LTT's landlord, William Hurd, e-mailed to SDP's president Eddie Alexander, SDP's Ed Bivins, LTT's Berry and LTT's contractor, stating: "This information is for the project review, please keep it confidential along with all of the information generated during this review process." 2CR7631; *see also* App. 7 ¶ 8. Because Defendants had notice that

---

[5] The Lawyer Defendants were bound, as agents of the Hospital Defendants, to maintain the confidentiality of LTT's trade secrets. Under the Confidentiality Agreement, each party agreed that, except for "evaluat[ing] participation in the Project," neither that party "nor its employees, agents, or business or professional associates will disclose or use any Confidential Information in any manner whatsoever." App. 8 ¶2. Similarly, the LOI imposed confidentiality obligations on "any director, officer, employee, member, shareholder, or agent of LRMC or SDP engaged in the evaluation of the Project." LOI ¶9.1. At the relevant times, Sossi was an owner, member, and agent of SDP as well as an officer and agent of LRMC. 2CR7743-47.

16

LTT's information was provided in confidence, they are liable for any disclosure or use after such notice. *See* Restatement (First) of Torts §§ 757 & 758 (1939).

Defendants recognized that all the parties involved in the contemplated transaction were under a duty of confidence. For example, Sossi sent an e-mail to ensure Healthcare REIT (LTT's landlord) knew that information exchanged during the project review was confidential:

> Based on our Letter of Intent with your Tenant, including the payment of over $50,000 to your tenant, we are greatly concerned that the Section 6 (Standstill and Non-Circumvention) and Section 9 (Confidentiality) provisions of that Letter of Intent, both of which survive any termination of that Letter of Intent, require your Tenant to have positive obligations to SDP and LRMC regarding any information exchanged related to that Letter of Intent. Those obligations specifically require that the Parties act in good faith and that any knowledge gained in the discussions not be used by the Parties for their own benefit. Further we believe that based on the nature of the discussions and negotiations ***these provisions also include any third party who was included in these discussions as agreed to by the Parties.***

2CR8016 (emphasis added).

Berry was personally involved in securing the Confidentiality Agreement and LOI, as well as LTT's confidentiality agreements with third parties, and stated that even after Defendants terminated the transaction, LTT continued to require third parties to agree to keep LTT's information confidential. App. 7 ¶8. Berry did not recall any instance in which LTT disclosed its trade secrets to a third party without an agreement to keep the information confidential. *Id.*

17

1245899

A plaintiff does not need to satisfy all six *Bass* factors to establish the existence of a trade secret; rather, trade secret status is "ascertained through a comparative evaluation of all the relevant factors," and that "other circumstances could be relevant to the analysis." *In re Bass*, 113 S.W.3d at 739-40. Here, LTT provided evidence supporting all six of the *Bass* factors. Viewing this evidence and indulging all reasonable inferences in LTT's favor, there is, at the very least, a genuine issue of material fact as to whether LTT's misappropriated information constitutes trade secrets. The trial court erred by ruling otherwise.

2. There is evidence that Defendants acquired LTT's trade secrets through breach of a confidential relationship or through improper means.

a. Confidential relationship

A misappropriation claim requires breach of a confidential relationship or that the trade secret was discovered by improper means. *Tex. Integrated*, 300 S.W.3d at 366-67. In respect to breach of a confidential relationship, both SDP and LRMC were parties to the LOI, and the Lawyer Defendants fell within the definition of "Representative" of a "Party." LOI at 1, §9.1. As such, each Defendant was subject to the nondisclosure and confidentiality obligations of that agreement as well as the earlier Confidentiality Agreement. App. 8 §2.

In addition, it is well-settled that "[t]rade secret information disclosed pursuant to negotiations for the sale of a business are disclosed under a duty of

18

confidence imposed as a matter of law." *H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 36 (Tex. App.–Corpus Christi 1997, pet. denied) ("*HEB*"); *see also Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*, 710 F.3d 579, 584 (5th Cir. 2013) (under Texas law, "[a]n express agreement [is] not necessary where the actions of the parties, the nature of their arrangement, the 'whole picture' of their relationship established the existence of a confidential relationship") (*citing HEB*). The examples quoted by the Court in *Hyde Corp.* are instructive here:

> A has a trade secret which he wishes to sell with or without his business. B is a prospective purchaser. In the course of negotiations, A discloses the secret to B solely for the purpose of enabling him to appraise its value. Or, A requests a loan from B, a banker, for the purpose of aiding the manufacture of a product by A's secret process. In order to assure B about the soundness of the loan, A discloses the secret to him in confidence. In both cases B is under a duty not to disclose the secret or use it adversely to A.

314 S.W.2d at 770 (quoting Restatement of Torts, § 757, cmt. (b)).

Here, the evidence shows that Defendants received LTT's trade secrets in confidence in the course of negotiations for the acquisition of LTT's primary asset (the Lake Travis Hospital facility), and the "whole picture" of the parties' relationship establishes the existence of a confidential relationship between each of the Defendants and LTT as a matter of law. App. 7 ¶¶ 2-10, 12. Defendants recognized as much before this suit was ever filed. 2CR8016 (Sossi e-mail stating that LOI provisions applied to LTT, LRMC, SDP, and "any third party who was

19

included in these discussions as agreed to by the Parties.") Thus, while the LOI and Confidentiality Agreement are each sufficient to establish a confidential relationship between all of the parties, even without those agreements, the context of the parties' negotiations is sufficient, at a minimum, to create material fact issue as to the confidential relationship between each of the parties.

b. Improper means

In respect to acquiring a trade secret through improper means, courts recognize that "[a] complete catalogue of improper means is not possible. … [i]n general they are means which fall below the generally accepted standards of commercial morality and reasonable conduct." *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 213 (Tex. App.—San Antonio 2013, pet. denied). "Improper means" includes, but is not limited to "theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Wellogix, Inc.*, 716 F.3d at 876.

Under Texas law, "the question is not 'How could [Defendants] have secured the knowledge?' but 'How did [they]?'" *Lamont*, 421 S.W.3d at 213. There is more than sufficient summary judgment evidence to raise a fact question as to whether Defendants improperly acquired the trade secret information from

20

LTT in addition to breaching their obligations of confidence.  *See* App. 7 ¶¶4-5 and 3CR11919-20 and evidence cited therein.

That fact question is not resolved by Sossi's contention that he acquired LTT information through communications with LTT's landlord, Healthcare REIT, when he provided legal advice to Healthcare REIT in respect to LTT.[6]  At most, this evidence raises a fact question whether the Lawyer Defendants breached their duty of confidence by disclosing to the Hospital Defendants and HUD information provided confidentially by or on behalf of LTT during the course of the Lawyer Defendants' representation of Healthcare REIT.  In fact, the trial court noted that "[t]he existence of the confidential, attorney-client relationship between REIT and Mr. Sossi" meant that the Defendants "must prove the information was available from another, non-confidential source" to establish it was in the public domain and thus no longer proprietary.  3CR12252.

In short, the evidence is sufficient to show a genuine issue of material fact as to whether Defendants acquired LTT's trade secrets through a confidential relationship or improper means, and the trial court erred to the extent it granted summary judgment on this ground.

---

[6] Notably, no Defendant tied the limited information Sossi claims he obtained through that confidential attorney-client relationship to any trade secret information identified in LTT's summary judgment responses.  *Compare* 2CR5238-39 to 3CR11912-20 and evidence cited therein.

1245899

3.     <u>There is evidence that Defendants disclosed or used LTT's trade secrets without authorization.</u>

Under Texas law, "one who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if … his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." *Hyde Corp.*, 314 S.W.2d at 770. Either disclosure or use is sufficient to impose liability. *Id.* Both apply here.

a.     <u>Defendants "used" the trade secrets.</u>

As a general matter, "any exploitation of [a] trade secret that is likely to result in injury to the trade secret owner *or enrichment to the defendant* is a 'use.'" *Wellogix, Inc.*, 716 F.3d at 877 (emphasis added). "'Use' can include 'activities other than the actual selling of the product.'" *Id.* "Any misappropriation of trade secrets, followed by an exercise of control and domination, is considered a commercial use." *Cudd Pressure Control*, 328 Fed.Appx. at 965. This can include "an act that 'lower[s] the market value' of a trade secret." *Wellogix*, 716 F.3d at 877. Unauthorized use "need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability.'" *Bishop v. Miller*, 412 S.W.3d at 774. "Use of a modified … version of the trade secret will not avoid liability if the version is substantially derived from the protected information." Restatement (Third) of Unfair Competition § 40 cmt. c (1995). Even if a final product "differs significantly from that of the

22

plaintiff, substantial use of the trade secret in the course of the defendant's research can be sufficient to constitute an appropriation." *Id.*; *accord Bishop v. Miller*, 412. S.W.3d at 774.

In *Cudd Pressure Control*, the Fifth Circuit reversed summary judgment based on "use" analogous to this case. 328 Fed.Appx. at 965-66. The plaintiffs' former employee, Roles, used some of the plaintiff's financial information to create a business plan circulated to investors for his new company, Great White. *Id.* at 966. That financial information was false as it related to Great White. *Id.* Roles also showed investors plaintiff's profit and loss statement "to validate [that] what I was telling them was true." *Id.* Reversing the district court's summary judgment based on an alleged lack of "use," the Fifth Circuit held that Roles "exercised control over [plaintiff's] confidential information to convince investors to finance Great White.… He therefore sought to profit from using the confidential information, and so 'used' it." *Id.* Accordingly, the Fifth Circuit held there was a question of material fact as to "use." *Id.*

Defendants similarly exercised domination and control over LTT's trade secrets in order to disparage LTT's Lake Travis Hospital as a competitor and convince HUD to insure LRMC's $166.9 million hospital mortgage. By doing so, Defendants obtained financing for their hospital (thus enriching themselves) while also diminishing the value of LTT's trade secrets. Just as in *Cudd*, Defendants'

23

actions create a question of material fact as to "use." *Id.* ("Use encompasses using a trade secret to procure financing.").

As is discussed more fully above in the statement of facts, during the project review, LTT provided Defendants with confidential, proprietary, and trade secret information it used to build and develop its hospital. App. 7 ¶¶6-7. This information, provided as documents or through site inspections and meetings, included mechanical and electrical specifications, architectural specifications, architectural drawings, responses to Defendants' architect PSP, and plats. *See, e.g.,* 3CR11919-20 and evidence cited therein. The information was not publicly available, was created for the development of LTT's hospital at considerable expense, and gave LTT a competitive advantage over those who did not know or use it. App. 7. This information, individually and in combination with each other, were trade secrets of LTT. *See Southwestern Energy*, 411 S.W.3d at 597.

After being provided LTT's trade secrets in confidence for the limited purpose of evaluating the feasibility of acquiring the LTT facility (LOI §§6, 9), Defendants used that information to draw conclusions about alleged conversion costs associated with the LTT facility. The summary judgment evidence shows that the review process resulted in a lengthy report from the Hospital Defendants' architect detailing alleged civil, architectural, mechanical, electrical, and other "noncompliance" issues and recommending various changes. 3CR8593-8616.

24

This resulted in a detailed response from LTT's architect, 3CR8637-47, as well a conference call among the Lawyer Defendants, the Hospital Defendants, PSP, and LTT's architect addressing the issues. 3CR8648-52. Defendants then used the information from LTT to determine the pricing of their proposed modifications.

To convince HUD that LTT was not a competitive facility, and thereby fund LRMC's $166.9 mortgage, Defendants used LTT's trade secrets in the May 10th Email and subsequent correspondence with HUD. 2CR8024-25. LTT did not consent to Defendants' use of LTT's trade secrets for that purpose. App. 7 ¶¶15-16. Defendants used the trade secrets to obtain significant economic benefits for themselves, and LTT was injured as a result. At a minimum, this evidence raises a fact question as to "use" of the trade secrets. *See Cudd Pressure Control*, 328 Fed.Appx. at 966; *see also Wellogix*, 716 F.3d at 877 ("any exploitation of [a] trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use,'" including "an act that 'lower[s] the market value' of a trade secret"); *see also Lamont*, 421 S.W.3d at 215 (despite defendants' testimony that they did not use trade secrets, the circumstantial evidence of the defendants' access to the information and conduct immediately afterward supported the jury's finding of misappropriation); *see also Bishop v. Miller,* 412 S.W.3d at 773 (attempts to use misappropriated information to attract investors constitutes impermissible "use").

25

b.     Defendants "disclosed" the trade secrets.

Disclosure means making something known or public.  *See* BLACK'S LAW DICTIONARY 562 (10th ed. 2014).  The trial court justified its summary judgment ruling by stating "[a]ll of the alleged secrets, in LTT's own presentation, are at least one step removed from any disclosure."  3CR12252.  The summary judgment evidence raises a fact question as to Defendants' disclosure of LTT's trade secrets.

Sossi testified that he "shepherded" the LRMC application through HUD and handled "any and all communications related to the HUD loan and LRMC." 2CR7776-77.  As part of "shepherding" the application, the Lawyer Defendants participated in a number of in-person meetings and telephone calls with HUD.  *Id*. at 7777-80, 7813, 7815.  Sossi admitted that he discussed LTT in sufficient detail to allow HUD to determine whether LTT would be a significant competitor to LRMC's proposed hospital:

> The existence of the plans for the [LTT factility] were discussed in detail with the HUD Client Service Team and [they concluded] the facility as planned would not appear to meet the general acute care needs for the Lakeway Community.

2CR8110.  Sossi's unequivocal admission raises a question of fact as to disclosure.

Sossi also asserted that he and the other Defendants "expect HUD to defend the decision to issue the Guarantee," and that HUD's due diligence process was "proper."  *Id.*  Sossi's May 10th Email was written in response to some of HUD's due diligence.  Given the substance of the May 10th Email, HUD's parroted

response in reliance on it, and the fact that HUD never communicated with LTT prior to making that response, it is reasonable to infer that SDP's verification of "Mr. Sossi's facts" included LTT's confidential trade secrets. *See Lamont*, 421 S.W.3d at 215 (circumstantial evidence of defendants' access to the information and conduct immediately afterward supported finding of misappropriation). The evidence also shows that LTT never authorized Defendants' disclosures. App. 7 ¶16. Judge Yelenosky erred to the extent he found no evidence of Defendants' unauthorized disclosures.

4.    There is evidence of damages as a result of the misappropriation.

In respect to damages, "the established rule is that the plaintiff is not required to prove lost profits; rather it need only prove misappropriation of its valuable trade secret and prove that it was put to some commercial use." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 540 (5th Cir. 1974). As discussed above, there is evidence of Defendants' misappropriation and commercial use of LTT's valuable trade secrets. Once that showing is made, "[d]amages in trade secret cases can take a variety of forms." *Southwestern Energy*, 411 S.W.3d at 608 (citing *Univ. Computing*, 504 F.2d at 535). For example, even if a plaintiff cannot prove that it suffered a specific injury caused by the defendant's use (which is not the case here), the court may instead award damages based on the *defendant's* actual profits gained by using the trade secret.

27

1245899

*Id*. at 609. In addition, "a lack of profit from [defendant's] misappropriation will not exempt the wrongdoer from liability in the amount of the trade secret's value when it was misappropriated." *Id.* Rather, the court may award a reasonable royalty, based on what the parties would have agreed to for the use of the trade secret at the time of the misappropriation if both had been reasonably trying to reach an agreement. *Id.*

        a.    <u>Loss of market value</u>

There is evidence that LTT suffered losses in market value to both itself and to its trade secrets as a result of Defendants' misappropriation. Berry, CEO and Managing Member of LTT, was familiar with and had personal knowledge of LTT as an entity, its value, and the loss of market value suffered by LTT as a result of Defendants' misappropriations at issue. App. 7 ¶15. Based on that knowledge, Berry stated that a conservative price a willing buyer would pay a willing seller in respect to LTT before Defendants' misconduct would have been $13,794,834. App. 7 ¶19. As a result of Defendants' misconduct, LTT lost nearly all of its value as an enterprise. *Id*.

In addition, Berry was familiar with the trade secret information LTT provided to Defendants, and stated the price a willing buyer would pay a willing seller for LTT's trade secrets at the time of the misappropriation was at least $7.9 million. *Id.* This market value was based on Berry's familiarity with the

28

discussions between LTT and the Defendants, the value LTT placed on its trade secrets and its reluctance to disclose them to competitors, his review of communications from HUD raising questions about competition in the Lakeway area, and evidence suggesting uncertainty about whether Defendants could get other sources of funding. App. 7 ¶¶ 19, 11. As a result of Defendants' conduct, LTT's trade secrets lost nearly all of their market value. *Id.* This unchallenged evidence of trade secret damages is sufficient to create a question of material fact as to damages. *See Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 853 (Tex. 2011) (officer of a company may testify as to the value of a company and its assets).

b.    Reasonable royalty damages

The evidence of the market value also provides evidence of the amount of reasonable royalty damages. In measuring reasonable royalty damages, courts consider, among others, the following factors: the resulting and foreseeable changes in the parties' competitive posture; prices paid by licensees in the past; the total value of the secret to the plaintiff, including the plaintiff's development cost and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternatives. *Univ. Computing*, 504 F.2d at 539; *Southwestern*

29

*Energy*, 411 S.W.3d at 610 (citing *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971), and the "fifteen factors considered in other leading cases in determining a reasonable royalty").

Berry considered many of these factors when determining the value of LTT's trade secrets at the time of misappropriation to be "at the least the consideration of $7.9 million contemplated by the LOI." App. 7 ¶15; *see Bohnsack v. Varco, L.P.*, 668 F.3d 262, 275-76 & 280 (5th Cir. 2012) (reversing $600,000 benefit-of-the-bargain fraud award but upholding $600,000 reasonable royalty award for misappropriation since "terms negotiated between [the parties] are sufficient evidence to prove the value" of the confidential information to a reasonably prudent investor).

   c.    <u>Benefits obtained</u>

Finally, Defendants profited handsomely from their misappropriation. They used the misappropriations in the May 10th Email to convince HUD to disregard LTT as a competitor and quickly fund the $166.9 million loan. *See* 2CR8017. Benefits obtained by the Defendants are recoverable as damages for LTT's misappropriation claim. *Southwestern Energy*, 411 S.W.3d at 609.

30

### d. No HUD reliance necessary

It is not necessary that LTT prove that HUD relied on the information in order to recover for trade secret misappropriation. Even if there was not sufficient evidence of HUD's reliance (and there was), the evidence raises questions of fact as to reasonable royalty damages, which are not dependent on proof that HUD relied on Defendants' improper disclosure of LTT's trade secrets. Instead, royalties are based on the value of the trade secret information at the time it was misappropriated. *Southwestern Energy*, 411 S.W.3d at 609.

Moreover, the summary judgment evidence easily raises a question of fact on the issue of HUD's reliance, as the trial court itself recognized: "LTT has met its summary judgment burden of providing circumstantial evidence that defendants' communications with HUD resulted in receipt of the loan guarantee and some evidence that the loan guarantee resulted in damages to LTT." 3CR12252. By law, HUD may only insure mortgages for "urgently needed hospitals." 12 U.S.C. § 1715z-7(a). It therefore can only insure mortgages for hospitals in underserved areas, 24 C.F.R. § 242.16, and information about potentially competing hospitals such as LTT was therefore material to whether HUD had the legal authority to insure the LRMC loan. Defendants' HUD expert observed that it would be "negligent" for HUD not to consider the information

31

about LTT in authorizing the loan, and HUD "would have been crucified for not doing due diligence; taxpayers would demand full review." 2CR8169-73.

In sum, there is sufficient evidence to raise a genuine issue of material fact as to each challenged element of LTT's claim for misappropriation of trade secrets. The trial court erred in granting summary judgment.

C.    Summary judgment was improper as to Section 2 of the LOI.

LTT alleged that the Hospital Defendants breached Section 2 of the LOI, which includes various provisions regarding the terms of the Project. LOI §2.[7] Judge Yelenosky granted summary judgment as to LTT's Section 2 claims. App. 3 ¶1. That was error. Section 2 is a binding provision, it includes all the terms necessary for its enforcement, and any alleged failure of conditions precedent to its enforcement was caused by the Hospital Defendants' own conduct.

1.    Section 2 of the LOI is a binding agreement.

a.    The detailed provisions are more than an agreement to agree.

LTT pled that the Hospital Defendants breached various terms of the LOI, including specifically Section 2. Section 2 of the LOI outlines the parties' agreement on the key terms for the proposed lease assignment ("Project") between LTT and LRMC. It includes detailed provisions regarding LRMC's assumption of LTT's lease, including the nature and intended legal effect of the assignment, terms of payment, and the reimbursement of costs. LOI §2. The LOI provides that

---

[7] The LOI is attached at App. 1.

32

the Section 2 terms are subject to the satisfaction of specific conditions, such as approval of LRMC's Board, the approval of HCN (LTT's landlord), and the mutual development of definitive documents "that *fully reflect* the intention of the parties *expressed in this Letter of Intent*." LOI §3. And the LOI obligates the parties to "use their respective best efforts to satisfy *each of the foregoing conditions as soon as reasonably practicable*...." LOI §3. In other words, Section 2 contains a comprehensive list of terms that were triggered by satisfaction of the five conditions precedent set out in Section 3 of the LOI.[8]

The Hospital Defendants moved for summary judgment that Section 2 of the LOI was not enforceable because it was merely an "agreement to agree."[9] 2CR5618. This argument fails under Texas law and the plain language of the LOI.

A recent opinion by the Supreme Court of Texas makes clear that an agreement is not an unenforceable "agreement to agree" simply because it

---

[8] Despite their argument that Section 2 was never intended to be enforceable, the Hospital Defendants also moved for summary judgment that "[c]onsummation of Section 2 of the LOI was based upon five conditions precedent" but "two of the five conditions were never satisfied." 2CR5622. If the parties intended for Section 2 to be "consummated" upon satisfaction of certain enumerated conditions, they necessarily also intended for Section 2 to be a binding contractual provision once those conditions were met.

[9] Judge Yelenosky rejected the Hospital Defendants' argument that the "best efforts" provision in Section 3 of the LOI was too vague, and thus rendered Section 2 of the LOI unenforceable. 3CR12250 ("I will grant the motions with respect to LTT's breach of Section 2 of the LOI, but not with respect to the "best efforts" provision in Section 3."); App. 3 (Order). Best efforts clauses, such as the clause here, that "set some kind of goal or guideline against which best efforts may be measured" are enforceable. *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App.—Dallas 1991, writ denied). The Hospital Defendants have acknowledged that the confidentiality and noncircumvision provisions of the LOI are binding. *See* 2CR8016.

33

1245899

contemplates future contracts. *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416 (Tex. 2013). The *McCalla* Court held that an "agreement that includes all of the terms necessary for the contract's enforcement is an enforceable contract as a matter of law, even if some of its terms seem to imply that the parties contemplate forming an additional contract in the future." 416 S.W.3d at 416. The Court repeated the well-settled principal that "[a]greements to enter into future contracts are enforceable if they contain all material terms." *Id.* at 418. While the contract in that case stated that the parties agreed "to execute any documents that [were] reasonable and necessary to carry out the terms and provisions of this Agreement," the Court noted that the agreement also "stated that it 'shall be binding upon … the parties …." *Id.* at 417 (ellipsis in original). The Court noted: "[i]f a court was trying to enforce the settlement agreement, it could find all the terms necessary for its enforcement," and thus held that the agreement was binding. *Id.* at 418.

*McCalla* was recently applied in the context of a letter of intent for a complicated commercial transaction. *See Karns v. Jalapeno Tree Holdings, LLC*, 459 S.W.3d 683, 691 (Tex. App.—El Paso 2015, pet. denied). The court of appeals held that if an LOI "contains all essential terms as contemplated by the parties and the only remaining issue is formalization of the agreement or negotiation of ancillary terms, *then the LOI may be an enforceable contract if the*

34

*parties intended to be bound.*" *Id.* at 692 (emphasis added). The provisions of the LOI easily meet this standard.

        b.        <u>The parties intended for all provisions of the LOI to be binding.</u>

The LOI plainly reflects the parties' intent to be bound. The introductory paragraph states, without exception, that it is a "*Binding* Letter of Intent." LOI at 1. And although Section 2 contains an "outline of terms" for the Project, its language makes clear that the detailed terms outlined therein were fully negotiated and agreed,[10] and it does not state that its terms may later be altered in future negotiations. LOI §2. Section 3 contains conditions precedent to the terms in Section 2, again demonstrating that the parties intended for Section 2's terms to become binding upon satisfaction of those conditions. LOI §3. The fact that one of the conditions was the "mutual development of definitive documents that *fully reflect* the intention of the Parties *expressed in this Letter of Intent*" further demonstrates the finality of the parties' substantive agreement on the key Project terms, as does the parties' agreement to use their "respective best efforts" to satisfy the conditions to consummation of Section 2. *Id*.

---

[10] *See, e.g.*, Section 2.1 ("LRMC *will assume* the Lease . . . and become the tenant. . .LRMC *shall ensure* that all such liabilities in favor of any third parties are released . . ."); Section 2.2 ("LRMC *will refund* at closing of the assignment of the Lease all deposits made by the Principals . . .[and] *shall assume* all liabilities and contractual obligations of the Principals . . ."); and Section 2.3 (". . . LRMC *will make* a single lump sum cash payment at closing to the Principals, or their designated assignee, equal to $1.5 million.") (emphasis added).

35

1245899

In addition, Section 10 states that "if any Party to this Letter of Intent breaches *any provision* of this Letter of Intent" irreparable harm shall be presumed. And Section 10.6 states:

> The persons executing this Letter of Intent personally represent and warrant that they have been duly authorized to do so by their respective Party and that, upon full execution hereof, this Letter of Intent *shall be a binding obligation of said Party*.

LOI §10.6 (emphasis added).

In sum, through the provisions of the LOI itself, the parties recognized and intended all provisions of the "Binding Letter of Intent," including section 2, to be binding and enforceable, not simply an "agreement to agree." At a minimum, these provisions create a question of fact as to whether the parties intended for Section 2 to be binding, making summary judgment on that issue improper. *See, e.g., Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988) (holding that the question of whether a letter agreement that was "subject to legal documentation" was intended to be binding was a question of fact properly presented to the jury).

      c.    <u>Section 2 contains all essential terms.</u>

To be enforceable, an agreement "must contain sufficient terms to determine the parties' obligations but is not required to resolve all disputed issues." *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 259 (Tex. App.—Austin 2002, no pet.). The parties may agree upon certain contractual terms and leave other matters

for later negotiations. *See Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972). "It is only when an *essential* term of a contract is left open for future negotiations that there is no binding contract . . ." *Geophysical Micro Computer Applications (Int'l) Ltd. v. Paradigm Geophysical Ltd.*, No. 05-98-02016, 2001 WL 1270795, at *3 (Tex. App.—Dallas Oct. 24, 2001, pet. denied) (not designated for publication) (citing *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex. App.—El Paso 1993, no writ)).

Section 2 of the LOI contains all essential terms for its enforcement. Section 2.1 states that LRMC "will assume the existing Lease," relieve the Principals of all liability under the Lease, and indemnify the Principals and their affiliates of any liabilities after the assignment of the Lease. Section 2.2 states that LRMC "will refund at closing of the assignment of the Lease all deposits made by the Principals and their respective affiliates and reimburse to the Principals and their respective affiliates all reasonable and documented costs that have been advanced by them to develop the Facility." Section 2.2 then further defines such costs to include, among other things, reimbursement of compensation of certain employees and other development-related expenses. Section 2.3 provides that, in exchange for assignment of the Lease, LRMC "will make a single lump sum cash payment at closing to the Principals or their designated assignee, equal to $1.5 million."

37

In short, Section 2 defines the specific obligations that must occur and explains when they must occur. "If a court was trying to enforce the [agreement], it could find all the terms necessary for its enforcement," and, just as in *McCalla*, the LOI contains the material terms for Section 2 to be enforceable.[11] 416 S.W.3d at 418. Section 2 of the LOI is thus a binding and enforceable provision, subject only to satisfaction of the conditions precedent in Section 3. As discussed below, the Hospital Defendants prevented these conditions from occurring, so they became legally responsible for failing to comply with Section 2.

2.    <u>The Hospital Defendants cannot rely on unsatisfied conditions precedent to avoid complying with Section 2 because their own conduct prevented performance.</u>

It is an "elementary" rule of contract law that "one who prevents or makes impossible the performance of a condition precedent on which his liability under a contract is made to depend cannot avail himself of its nonperformance." *II Deerfield Limited Ltd. P'ship v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App.—San Antonio 2001, pet. denied). One court of appeals recently looked at a set of conditions precedent that the defendant claimed the plaintiff had not satisfied. *Sharifi v. Steen Automotive, LLC*, 370 S.W.3d 126, 146 (Tex. App.—

---

[11] The Hospital Defendants' argument below that the LOI does not contain specific amounts for compensation, severance, and reimbursement does nothing to prevent the enforceability of those obligations. First, such details relate to the form and not the substance of the transaction; they are not essential terms. *See McCulley*, 860 S.W.2d at 477. Second, under Texas law, such provisions are enforceable even without specific figures. *See Fuqua v. Fuqua*, 750 S.W.2d 238, 245 (Tex. App.—Dallas 1988, writ denied) (holding that an agreement to pay rent at a "reasonable rate" is not too indefinite to be enforced).

1245899

Dallas 2012, no pet.). Three conditions in particular involved the *defendant's* payment of debts to a third party. *Id*. The court held the defendant could not rely on the non-occurrence of the conditions, which was due to the defendant's "choice not to perform." *Id*.

Similarly, in another case plaintiffs had an agreement with a water authority where plaintiffs would receive seventy percent reimbursement of certain costs if the voters passed a required bond measure. *Clear Lake City Water Auth. v. Friendswood Dev. Co., Ltd.*, 344 S.W.3d 514, 517 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The defendants failed to include the measure on the ballot, thereby prevented the occurrence of the condition precedent, and argued that "nonoccurrence of this condition…is not excused if the [defendant] can establish that the voters would not have approved the 2004 bond measure had it been included on the ballot." *Id.* The court rejected that argument and held that "the Authority cannot rely on a projected failure of voter approval, which it prevented or made impossible…to escape its liability to purchase the Developers' facilities." *Id*.

Here, the Hospital Defendants moved for summary judgment that "two of the five conditions" in the LOI were not satisfied.[12] 2CR5622. First, they claimed that "the approval of HCN as landlord under the Lease to the assignment thereof"

---

[12]    The Hospital Defendants did not allege that the parties' failure to develop definitive agreements was an unsatisfied condition.

39

was never satisfied. 2CR5623. "Lease" is defined as the lease for the LTT hospital facility. LOI at 1. Section 2 requires LRMC to "assume the *existing* Lease" between LTT and the landlord. LOI § 2.1 Section 3 requires LRMC to make best efforts to secure approval from "the landlord under the Lease to the assignment thereof." Sossi's uncontroverted testimony, however, shows that Defendants never sought approval for assignment of the "*existing* Lease" as required by the LOI:

> Q. Did you negotiate with HCN as landlord under the lease on behalf of LRMC to the assignment of Exhibit 1?

> A. Yes. But for an amended and restated lease.

> Q. As a lawyer, Mr. Sossi, do you understand the difference between the assignment of an existing document and the renegotiation and execution of a new document?

> A. If a specific document is identified, yes.

> \*\*\*\*\*

> Q. Did you negotiate with HCN as landlord under the lease on behalf of LRMC to the assignment of Exhibit 1 without modification?

> A. No, not without modification.

2CR7771-72; *see also* 7766-71.

In other words, the evidence shows that Defendants made no effort, much less a best effort, to get approval from the Landlord for the assignment of the *existing* Lease. The Hospital Defendants did not satisfy this condition, and cannot

40

rely on its nonoccurrence to avoid liability for breach. *See II Deerfield*, 41 S.W.3d at 265; *Clear Lake*, 344 S.W.3d at 517; *Sharifi*, 370 S.W.3d at 146.

The Hospital Defendants alleged that one other condition was not satisfied, that of "full and formal approval by the Board of Managers of LRMC…" 2CR5624. LRMC's corporate representative Eddie Alexander admitted that LRMC's Board never took a vote on approval of the project. 2CR7721. Just as in *City of Clear Lake Water Authority*, the Hospital Defendants cannot rely on the lack of a vote they failed to take to avoid compliance with Section 2 of the LOI. 344 S.W.3d at 517 (holding defendant "cannot rely on a projected failure of voter approval, which it prevented or made impossible…to escape its liability").

The evidence creates at least a question of fact on whether the Hospital Defendants prevented the two conditions precedent from occurring. These were the only conditions precedent that the Hospital Defendants relied on in moving for summary judgment. Judge Yelenosky erred in granting the Hospital Defendants' motions and dismissing LTT's claims for breach of Section 2 of the LOI.

D. <u>The trial court abused its discretion in sustaining objections to some of LTT's summary judgment evidence.</u>

This Court reviews rulings on summary judgment evidence for abuse of discretion. *Woodhaven Ptnrs, Ltd. v. Shamoun & Norman, LLP*, 422 S.W.3d 821, 829 (Tex. App.—Dallas 2014, no pet.). Judge Yelenosky abused his discretion by

excluding portions of LTT's summary judgment evidence. App. 4.[13]  The excluded

evidence relates to LTT's ownership of the proprietary and trade secret information

(Exhibits 1, 33), and to Defendants' misuse of that information in their

communications with HUD (Exhibits 23-29).  Because the evidence was not

objectionable, this Court should consider it in ruling on summary judgments.

1.       The court improperly sustained objections that had become moot.

As a threshold procedural matter, the court erred in excluding portions of the

Project File (Exhibit 33), as well as Exhibits 23-29, because LTT's Amended MSJ

Responses mooted some of the Hospital Defendants' objections.[14]

LTT responded to the Hospital Defendants' motions for summary judgment

("Original MSJ Responses") and filed an Appendix and Supplemental Appendix

("Appendix") of supporting evidence.[15]     3CR9542-9626 (SDP), 9627-9706

---

[13] The trial court ruled on the Hospital Defendants' objections to LTT's summary judgment evidence, but it did not rule on the Lawyer Defendants' objections.  App. 4 (order addressed to the Hospital Defendants' objections only).  There are thus no rulings for LTT to appeal because the court did not exclude any evidence in connection with the Lawyer Defendants' summary judgment motions.  *See Investment Retrievers, Inc. v. Fisher*, No. 03-13-00510-CV, 2015 WL 3918503, at *4 (Tex. App.—Austin June 25, 2015, no pet.) (mem. op.) ("[A] trial court's ruling on an objection to summary-judgment evidence is not implicit in its ruling on the motion for summary judgment.").  Further, the Lawyer Defendants waived their objections to procedural defects in LTT's evidence by failing to obtain a ruling.  *Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 753 (Tex. App.—Corpus Christi 2001, pet. denied).  Regardless, the Lawyer Defendants' objections to the evidence fail for the same reasons as the Hospital Defendants' Objections.

[14] Regarding Exhibit 23—the May 10th Email—the Hospital Defendants also filed that exhibit, so it is properly in the summary judgment record irrespective of any objection to it in LTT's summary judgment appendix.  *Compare* 2CR5716-19 (LRMC Ex. 8) and 8267-70 (LTT Ex. 23).

[15] The Appendix is out of order in the Clerk's Record and appears in several non-sequential chunks: 2CR7598-8555, 3CR8580-9541, 3CR9707-11421, 3CR11882-98.  Exhibits 23-29 appear at 2CR8265-8480.

1245899

(LRMC). The Appendix identified all of the evidence on which LTT relied in responding, including a detailed index of the categories of information in Exhibit 33, the Project File, and it stated that the "summary judgment evidence in this Appendix is hereby incorporated" into the responses. 2CR7598.

The Hospital Defendants filed objections to LTT's summary judgment evidence (3CR11486-524), arguing that LTT should have specifically cited to each page of the Project File, so the court should not consider any pages in the Project File "other than the 189 pages specifically referred to and identified in the" Original MSJ Responses. 3CR11487 (Objection 2). The Hospital Defendants also objected to Exhibits 23-29 because LTT had not specifically cited to those Exhibits in its Original MSJ Responses. *Id.* at 11489 (Objection 5).

LTT later filed amended responses to the Hospital Defendants' motions for summary judgment ("Amended MSJ Responses"). 3CR11790-881 (SDP), 3CR11899-982 (LRMC). In the Amended MSJ Responses, LTT added specific citations to hundreds of additional pages—totaling over 775 pages—in the Project File. *See, e.g.*, 3CR11919-20 (identifying specific materials within the Exhibit 33 Project File by bates number). LTT also added specific citations to Exhibits 23-29. *See, e.g.*, 3CR11906 n.26, 11918 n.63, 11919 n.66. The Hospital Defendants did not file amended objections, even after LTT pointed out that the Amended MSJ Responses had mooted objections to the lack of page citations in the Original MSJ

43

Responses. 3CR12017, 12022. Nevertheless, the court sustained the Hospital Defendants' Objections 2 and 5, which were based solely on a lack of citation to the evidence in the Original MSJ Responses. App. 4.

The impact of the trial court's ruling on this point is unclear. Given that the stated objections were only to pages and exhibits not cited by LTT, the ruling sustaining the objections cannot actually exclude any evidence because LTT cited to all the challenged evidence in its Amended MSJ Responses. However, if the ruling is construed to exclude any portions of these exhibits, then the trial court's ruling was plainly in error.

First, LTT's Amended MSJ Responses mooted the Hospital Defendants' objections to the lack of sufficient citation in the Original MSJ Responses. The trial court erred in sustaining objections that were based on a superseded pleading. *See, e.g., Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) (holding the court erred in granting summary judgment based on pleading that had been superseded); *Krainz v. Kodiak Resources*, Inc., 436 S.W.3d 325, 328 (Tex. App.—Austin 2013, pet. denied) ("When amended petitions are filed timely, trial courts must base their decision on the amended pleading, not any superseded petition."). Second, LTT's specific and detailed citations to the evidence in the Amended MSJ Responses cured the Hospital Defendants' objections.

44

2. <u>LTT adequately cited to the entirety of the Project File.</u>

The court independently erred in sustaining the Hospital Defendants' objection to "uncited references" within the Project File because LTT's citations were sufficient.

The Project File is a compilation of all documents that reflected LTT's trade secret and proprietary information at issue in the case. The Index to the Appendix identified by bates number the categories of documents included within the Project File, and LTT's Amended MSJ Responses gave specific references, by bates number, to about 775 individual pages within the Project File. LTT identified and described the nature of the Project File as a whole and explained the basis for its inclusion as summary judgment evidence. *See, e.g.,* 3CR11922. LTT also provided detailed testimony on the contents of the Project File in the Berry Declaration. App. 7. The citations and descriptions in the Appendix, the Berry Declaration, and the body of the Amended MSJ Responses sufficiently directed the court to the evidence on which LTT relied.

Texas law does not require that each page of a documentary exhibit be individually cited in a summary judgment response. "A non-movant need not set out the exact evidence on which it relies or explain with specificity how this evidence supports the issues it raises; *summary judgment is not a trial by affidavit or deposition*. Evidence need only be referenced or attached in order for a court to

45

consider it." *Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*, 106 S.W.3d 380, 387-88 (Tex. App.—Austin 2003, no pet.) (emphasis added)(citations omitted).

Here, the Project File, although by its nature a large exhibit, was well organized and supported by detailed testimony explaining why its contents supported LTT's claims. Further, all the documents in the Project File collectively comprised LTT's documentary evidence of its trade secret and proprietary information. This was not a situation where an entire deposition is generically referenced in a response without any citation to the relevant portions. All the documents in the Project File were relevant, they were relevant as a whole, and the Amended MSJ Responses explained in detail why this was the case.

Judge Yelenosky's conclusion—that only those pages in the Project File that were specifically cited by bates number were admissible—puts an unreasonable and unsupported obligation on the party responding to summary judgment. For example, must all the pages in a lengthy contract be individually discussed in order for the contract, as a whole, to be admissible? Of course not. LTT adequately cited to the entire Project File, and the trial court's ruling was in error.

3.  <u>The court erred in sustaining an objection to *argument* that the Project File as a whole is a trade secret.</u>

The Hospital Defendants objected to any "*suggestion* that Exhibit 33 [the Project File] constitutes a trade secret." 3CR11486 at Objection No. 1. They

argued that the Project File was a compilation of separate documents and objected "to any argument, suggestion, or purported evidence that the so-called Project File is itself a combination or compilation trade secret that is at issue in this case." *Id.* at 11487. In other words, rather than objecting to the admissibility of Exhibit 33 itself, the Hospital Defendants objected to any *argument* that the Project File, as a whole, was a trade secret.[16]

The court sustained Objection No. 1 as follows: "Sustained to Exh. 33, except for those Bates numbered documents actually referenced in Plaintiff's response." App. 4. This ruling makes no sense in light of the objection presented to the Court, which had nothing to do with whether LTT had cited to individual pages. Further, the Hospital Defendants did not seek exclusion of any pages of the Project File, but rather sought to exclude any *argument* that the entirety of the Project File was a trade secret. The objection on its face is invalid—it was not an evidentiary objection but instead challenged the merits of Plaintiff's claim. The question of whether the information contained in the Project File was really a trade secret, or a collection of trade secrets, was an appropriate issue for debate in the summary judgment briefing on the merits; it was not a proper basis for excluding any portion of Exhibit 33.

---

[16] As is discussed in section B.1 of the Argument, the summary judgment evidence raises at least a fact question as to whether the Project File, taken as a whole, is a trade secret.

4.    Berry's testimony about the Project File was proper.

The court sustained the Hospital Defendants' objection to the following two statements in the Berry Declaration: (1) LTT "owned the confidential, proprietary and trade secret information contained in the Project File," and (2) LTT's principals "had an ownership interest in the information as well, and were authorized to disclose it pursuant to the LOI on behalf of" LTT.  3CR11488 (Objection No. 4); App. 4 (Order); App. 7 (Berry Declaration).  The Hospital Defendants objected that these statements were conclusory because "Mr. Berry does not . . . actually provide any facts regarding Plaintiff's purported acquisition, development, or ownership of [the information]."  3CR11488.  It was error to sustain that objection, for two reasons: (1) it was based on an inaccurate assumption about how to prove ownership of a trade secret; and (2) Berry's statements about ownership were based on his personal knowledge and supported by detailed facts regarding the information at issue.

First, proving ownership of a trade secret is different from proving fee simple title ownership of real or personal property:

> While trade secrets are considered property for various analyses, the inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim. The conceptual difficulty arises from any assumption that knowledge can be owned as property . . . While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. *As a consequence, one*

48

> *"owns" a trade secret when one knows of it, as long as it remains a secret. Thus, one who possesses non-disclosed knowledge may demand remedies . . . against those who 'misappropriate' the knowledge.*

*DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (emphasis added); *see also In re Cayman Island Firm of Deloitte & Touche,* No. 04-01-00491-cv, 2001 WL 1042233, at *2-3 (Tex. App.—San Antonio Sept. 12, 2001, no pet.) (relying on *DTM Research* and holding that party who possessed confidential information could claim trade secret privilege irrespective of chain-of-title ownership rights); *cf. Oryon Technologies, Inc. v. Marcus*, 429 S.W.3d 762, 764 (Tex. App.—Dallas 2014, no pet.) (citing *DTM Research* and noting that a central feature of a trade secret is the right to exclude others from the information).

A party may therefore prove ownership of a trade secret in multiple ways, such as by proving that it created or developed the trade secret, *Bishop v. Miller*, 412 S.W.3d at 771, or by proving that it possessed the non-disclosed information, and that the information remained a secret, *DTM*, 245 F.3d at 332. The Berry Declaration does both.

For example, Berry details the time, effort, and expense that went into LTT's development of the trade secrets. App. 7 ¶11. He also specifies, by detailed descriptive categories, the confidential information that LTT possessed and used in its business. *Id*. ¶7. He testifies that the documents reflecting this information were contained in the Project File, which he references and authenticates. App. 7

49

¶¶5-7. Berry also explains that LTT took steps to preserve the secrecy of this information, both internally and externally, by limiting employee access to the information and requiring third parties to enter confidentiality agreements before accessing the information. App. 7 ¶¶7–10.

Berry also describes the basis for his personal knowledge: he was the Managing Member and CEO of LTT, as well as one of its two owners. App. 7 ¶¶5-6. He states that he served in this position "[a]t all relevant times, including from the beginning of 2009 up to the present day." ¶13. He indicates that he is familiar with all the information in the Project File, which he describes in detail. ¶7. He testifies that he has reviewed that information, and that "[m]uch of the information in the Project File is or reflects confidential and proprietary information that provided LTT with a competitive advantage . . ." ¶7. Berry does not simply state that he, as a principal, owned the trade secrets. Instead, Berry explains that his ownership interest and his authority to disclose the information derive from his role as a Managing Member and CEO of LTT. ¶13.

Berry's testimony regarding the basis for his personal knowledge is more than sufficient under Texas law. *See Woodhaven*, 422 S.W.3d at 842-43 (affiant demonstrated a sufficient basis for his personal knowledge via testimony about his position within a law firm, and his references to attached supporting documents); *Nguyen v. Citibank N.A.*, 403 S.W.3d 927, 931 (Tex. App.—Houston [14th Dist.]

50

2013, pet. denied) (affidavit testimony on Citibank's ownership of an account was admissible and non-conclusory when based on affiant's personal knowledge as custodian of records and her review of the records).

When read in context with the rest of Berry's fourteen-page declaration, there is nothing conclusory about the two excluded statements. Berry's statements regarding ownership of the confidential information in the Project File are admissible and should be considered by this Court in ruling on the merits of summary judgment. Given Berry's detailed testimony on these matters, his Declaration as a whole establishes LTT's ownership even if this Court affirms the trial court's exclusion of the two challenged sentences.

## CONCLUSION AND PRAYER

As noted at the start of this brief, this cross-appeal presents simple, plain-vanilla issues of summary judgment review and the existence of fact questions. LTT's summary judgment evidence is more than sufficient to raise a fact question as to its claims for misappropriation of trade secrets and breach of Section 2 of the LOI. LTT therefore respectfully prays that this Court reverse the orders granting partial summary judgment as to those claims (App. 2, 3), as well as the order sustaining certain of the Hospital Defendants' objections to LTT's summary judgment evidence (App. 4), and remand those claims to the trial court.

51

Respectfully submitted,

**SCOTT DOUGLASS**
    **& MCCONNICO LLP**
303 Colorado Street, 24th Floor
Austin, TX  78701
(512) 495-6300
(512) 495-6399 Fax

By:  /s/ *Jane Webre*_____
      Jane M.N. Webre
      State Bar No. 21050060
      jwebre@scottdoug.com
      S. Abraham Kuczaj, III
      State Bar No. 24046249
      akuczaj@scottdoug.com
      Robyn B. Hargrove
      State Bar No. 24031859
      rhargrove@scottdoug.com

      COUNSEL FOR LTT

52

1245899

<u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing pleading was served on the following counsel of record via the CM/ECF electronic noticing system and e-mail, on September 21, 2015.

Jeff Cody
Barton Wayne Cox
NORTON ROSE FULBRIGHT
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784

Joy Soloway
NORTON ROSE FULBRIGHT
1301 McKinney, Suite 5100
Houston, TX 77010-3095

Robert A. Bragalone
B. Ryan Fellman
GORDON & REES, LLP
2100 Ross Avenue, Suite 2800
Dallas, TX 75201

Jessica Z. Barger
Raffi Melkonian
Wright & Close, LLP
One Riverway, Suite 2200
Houston, TX 77056



_____/s/ *Jane Webre*_____
Jane Webre


<u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing instrument was prepared using Microsoft Word 2010, and that, according to its word-count function, the sections of the foregoing pleading covered by TRAP 9.4(i)(1) contain 12,736 words.

_____/s/ Jane Webre_____
Jane Webre

53

<u>APPENDIX</u>

The following items are included in the Appendix to this brief:

App. 1:     Letter of Intent (PX2; 2CR7623-29)

App. 2:     Order on summary judgment as to the Lawyer Defendants (7/17CR201-02)

App. 3:     Order on summary judgement as to the Hospital Defendants (3CR12266-67)

App. 4:     Order on the Hospital Defendants' objections to LTT's summary judgement evidence (3CR12261)

App. 5:     Charge of the Court (3CR12997-13009)

App. 6:     Judgment (6/18CR3-5)

App. 7:     Declaration of Robert Berry, without exhibits (2CR7604-7617)

App. 8:     Confidentiality Agreement (2CR7619-21)

1245899

# APP. 1

 SURGICAL DEVELOPMENT PARTNERS

G. Edward Alexander
Direct Telephone Number: 615-550-2600 · ext 12
Cell Phone Number: 615-289-9896
Direct Telefax Number: 615-550-2601
E-Mail:
ealexander@surgicaldevelopmentpartners.co
m

John T. Prater
Direct Telephone Number: 615-550-2600 · ext 13
Cell Phone Number: 615-714-1898
Direct Telefax Number: 615-550 -2601
E-Mail:
jprater@surgicaldevelopmentpartners.com

VIA E-MAIL – September 15, 2009

Mr. Robert F. Berry
Mr. R. Keith McDonald
13706 Research Blvd., Ste 102
Austin, TX 78750
rfberryok@yahoo.com

RE: **Letter of Intent for the Acquisition of the Lakeway Hospital Lease**

Dear Robert and Keith:

Thank you for the opportunity to re-affirm our interest in the acquisition of the lease (the "Lease") for the hospital facility currently under construction in Lakeway, Texas (the "Facility") as the initial campus for Lakeway Regional Medical Center, LLC ("LRMC") and to serve as a key satellite facility for LRMC after the main campus for LRMC is developed (the "Project"). Surgical Development Partners, LLC, ("SDP") is pleased to submit this Letter of Intent, as the agent for LRMC, to each of you (collectively, the "Principals") (each a "Party" and collectively the "Parties") for the Parties to work in good faith with each other to plan, form, develop, fund, acquire, open and operate the Project. The objective of this Binding Letter of Intent is to indicate SDP's interest in the Project and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project and the exchange of information required for such a process to succeed. To clarify this relationship and to best protect the interests of all of the Parties, the Parties hereto agree as follows:

1. **Discussions and Negotiation of the Project.** Upon the execution of this Letter of Intent the Parties will enter into discussions and negotiations for a period of forty-five (45) days, which may be extended by the mutual agreement of both parties (the "Negotiation Period"), with regards to evaluating and implementing the proposed Project with one another as well

Exhibit
2
Berry
8/8/13

LTT v LRMC/SDP
No. D-1-GN-12-000983

PX0002

LTT002154
Confidential

as with any third party, as agreed to by the Parties, for the development and implementation of the Project.

2. **The Proposed Outline of the Terms of the Project.** As we have discussed the outline of the terms for the Project are as follows:

2.1. **Acquisition of the Lease.** LRMC will assume the existing Lease between Lake Travis Transitional LTCH, LLC (or its assignee controlled by the Principals) and HCN Interra Lake Travis LTACH, LLC ("HCN") and become the tenant under the Lease. The Principals and each and every one of their respective affiliates will be relieved of all liability related to the Lease and the Facility upon the assignment of the Lease to LRMC, including, without limitation, the release of any guaranties relating to the Lease by the Principals or any of their respective affiliates, and LRMC shall ensure that all such liabilities in favor of any third parties are released in connection with the assignment of the Lease and shall indemnify and hold the Principals and their respective affiliates harmless from any and all such liabilities from and after the assignment of the Lease.

2.2. **Reimbursement of Deposits and Costs; Assumption of Obligations.** LRMC will refund at closing of the assignment of the Lease all deposits made by the Principals and their respective affiliates and reimburse to the Principals and their respective affiliates all reasonable and documented costs that have been advanced by them to develop the Facility, including, without limitation, compensation and benefits paid to employees of the Principals and/or their respective affiliates responsible for the planning and construction of the Facility, all expenses incurred in connection with the planning and construction of the Facility, and interest expense associated with indebtedness incurred in connection with the Facility. In addition to the foregoing, LRMC shall assume all liabilities and contractual obligations of the Principals and their respective affiliates incurred with respect to the Facility (whether relating to its development or its ongoing operations following its commencement of operations). In particular and without limiting the foregoing, LRMC shall either offer employment at their current compensation levels to, or shall reimburse Principals and their respective affiliates, as applicable, for severance equal in the aggregate to six months' of such current compensation for, each of the following personnel relating to the Facility: Chief Operating Officer, Vice President of Facilities Management, Vice President of Ancillary and Support Services, Clinical Specialist (Infection Control Nurse), Vice President of Medical Affairs, and Director of Facilities Management.

2.3. **Lump Sum Payment.** In exchange for the assignment of the Lease to LRMC, LRMC will make a single lump sum cash payment at closing to the Principals, or their designated assignee, equal to $1.5 million.

LTT002155
Confidential

3. **Required Approvals for the Project.** The above indicated terms in Section 2 will be subject to the following conditions: (i) full and formal approval by the Board of Managers of LRMC; (ii) the approval of HCN as landlord under the Lease to the assignment thereof; (iii) a reasonable due diligence process related to the feasibility of the Facility to serve as a campus for a general acute care hospital as configured or reasonably modified; (iv) the ability of LRMC to obtain appropriate funding to allow for this expansion of the operational plans for LRMC; and (v) the mutual development of definitive documents that fully reflect the intention of the Parties expressed in this Letter of Intent. The Parties agree to use their respective best efforts to satisfy each of the foregoing conditions as soon as reasonably practicable, subject to the other terms of this Letter of Intent.

4. **Earnest Money.** In consideration of the Principals' willingness to enter into this Letter of Intent and disclose Proprietary Information relating to the Lease and the Facility to SDP and LRMC, SDP shall cause LRMC to deposit as earnest money the amount of $50,000 with an escrow agent mutually acceptable to the Parties on or before the fifth day following execution of this Letter of Intent. In the event this Letter of Intent is terminated by or on behalf of LRMC for any reason, or in the event definitive agreements for the transactions contemplated herein are not executed by the parties during the Negotiation Period (unless the failure to execute one or more definitive agreements lies with or is attributable to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent), the earnest money, including all interest thereon, shall be forfeited to Principals. If Principals terminate this Letter of Intent, or if definitive agreements for the transactions contemplated herein are not executed by the parties due to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent, the earnest money, including all interest thereon, shall be returned to LRMC.

5. **Term.** This Letter of Intent will remain open for acceptance until September 17, 2009. After acceptance this Letter of Intent may be terminated by either Party, for any reason, with written notice to the other Party, subject to the provisions described above relating to the entitlement to the earnest money, and below related to the sharing of information gained in the negotiation and development process.

6. **Standstill and Non-Circumvention Provisions.** Each of the Parties recognizes and acknowledges that in connection with such meetings and the exchange of information to discuss the Project, all Parties will need to act in good faith and not use any knowledge gained in the Project discussion process for their own benefit and exclusive of the rights or interests of the other Party. In order to accomplish that goal, the Parties agree: (i) that Principals will not enter into negotiations with any third party for the assignment of the Lease while this Letter of Intent is in force; (ii) LRMC will not enter into negotiations with any third party for the use of any site, other then the intended LRMC main campus site, as an alternative or satellite facility while this Letter of Intent is in force; and (iii) not to share any information with third parties gained in the negotiation and development process for the

LTT002156
Confidential

Project or to independently use any proprietary information of the other Party in any discussions or negotiations regarding this Project with third parties after the acceptance of this Letter of Intent. The parties agree that these standstill provisions shall not apply to the continued work by Principals on their plans for the operation of the Facility, the continued recruitment of potential investors by Principals to be equity holders in the Principals' project, or other operational matters relating to the Facility during the term of this Letter of Intent, but no such discussions shall preclude the Principals from entering into the definitive agreements contemplated in this Letter of Intent or from consummating the transactions contemplated herein.

7. **Fees and Expenses.** Each party will bear its own expenses associated with the development of the overall strategy and the interaction of the Parties in developing the definitive terms for the agreements contemplated by this Letter of Intent.

8. **Relationship Between the Parties.** None of the provisions of this Letter of Intent are intended to create, nor shall be deemed or construed to create, any relationship between the Parties and any of the Parties' vendors or agents and any of the Parties, other than that of independent entities contracting with each other hereunder solely for the purpose of providing the services described in this Letter of Intent as independent contractors, and otherwise maintaining and carrying out the provisions of this Letter of Intent. None of the Parties nor any of their respective agents or employees shall be construed to be the agent, employer, employee, partner, joint venturer, or the representative of the other parties hereto, for any purpose of any kind or nature whatsoever. Both Parties agree to hold the other harmless from third-party liability resulting from acts of any Party.

9. **Confidentiality.** The Parties desire to assure the mutual confidential status of any information which may be disclosed to or from any Party in the evaluation of this Project and the indicated approach to the Project:

   9.1. Proprietary Information. Except as provided in Subsection 9.7., below, all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner shall be deemed "Proprietary Information." The term "Representative(s)" means, in the case of LRMC or SDP, any director, officer, employee, member, shareholder, or agent of LRMC or SDP engaged in the evaluation of the Project, and in the case of Principals, Robert F. Berry and R. Keith McDonald.

   9.2. Permissible Use. Each Party that receives Proprietary Information (referred to as the "Receiving Party") shall use the Proprietary Information received from any other Party (referred to as the "Disclosing Party") solely to evaluate the feasibility of the Project or similar transactions between the Parties. No other rights are implied or granted under this Letter of Intent.

**LTT002157**
**Confidential**

9.3. Reproduction. Proprietary Information received shall not be reproduced in any form except for internal use of the Receiving Party and its Representatives and only for the express purpose of evaluating the Project.

9.4. Nondisclosure. The Receiving Party shall use all reasonable efforts to protect the Proprietary Information received with the same degree of care used to protect its own Proprietary Information from unauthorized use or disclosure, except that such Proprietary Information may be used or disclosed to the Receiving Party's Representatives as may be reasonably required to evaluate the Project.

9.5. Ownership of Information. All Proprietary Information, unless otherwise specified in writing, shall remain the property of the Disclosing Party and promptly upon request of either Party shall be returned to the Disclosing Party (including all whole or partial copies thereof and any written notes made regarding the Proprietary Information).

9.6. No License or Interest. No rights or obligations other than those expressly recited herein are to be implied. No license is granted to the Receiving Party or otherwise implied, by estoppel or otherwise, with respect to any property or right of Disclosing Party, presently existing or acquired in the future, or for any use of or interest in the Proprietary Information except such use expressly contemplated by this Letter of Intent.

9.7. Exclusions. It is understood that the term "Proprietary Information" does not include Information which:

   (a.) is now or hereafter in the public domain through no fault of the Receiving Party;

   (b.) prior to disclosure hereunder, is properly within the rightful possession of the Receiving Party;

   (c.) is lawfully received from a third party with no restriction on further disclosure; or

   (d.) is obligated to be produced under applicable law or order of a court of competent jurisdiction, unless made the subject of a confidentiality agreement or protective order.

## 10. Miscellaneous.

10.1. Remedies. Based on the subject matter of this Letter of Intent and the mutual obligations and duties indicated herein material and irreparable harm shall be presumed, if any Party to this Letter of Intent breaches any provision of this Letter of Intent. The Parties agree, that in the case of the breach of any of the non-circumvention

LTT002158
Confidential

or confidentiality provisions of this Letter of Intent, the non-breaching Party will have the right to request that any court of competent jurisdiction shall immediately enjoin the Party in breach in addition to that Party being entitled to all other rights and remedies which the Party may have at law or in equity.

10.2. Compelled Disclosure. In the event a Party, any of its Representatives, or anyone to whom any Party transmits the Proprietary Information, becomes legally compelled to disclose any of the Proprietary Information, prior to such disclosure such Party will provide the owner of the Proprietary Information with advance written notice and a copy of the documents and information relevant to such legal action, so the owner of the Proprietary Information may seek a protective order or other appropriate remedy to protect its interests in the Proprietary Information, and the compelled Party shall furnish only that portion of the requested Proprietary Information that the compelled Party is advised by a written opinion of counsel is legally required.

10.3. Entire Agreement. There are no other understandings, agreements, or representations, express or implied, between the Parties, not herein specified until such time as definitive agreements for proposals and letters of understanding can be developed and agreed to by the Parties for any individual Project. This Letter of Intent may not be amended except in a writing executed by all Parties.

10.4. Assignment. This Letter of Intent may not be assigned without the express written consent of all of the other Parties.

10.5. Governing Law. This Letter of Intent and all transactions contemplated by this Letter of Intent shall be governed by the laws of the State of Texas.

10.6. Counterparts. This Letter of Intent may be executed in any number of copies and by the different Parties hereto on separate counterparts. Each counterpart shall be deemed an original, but all counterparts together shall constitute one and the same instrument. The persons executing this Letter of Intent personally represent and warrant that they have been duly authorized to do so by their respective Party and that, upon full execution hereof, this Letter of Intent shall be a binding obligation of said Party.

10.7. Termination. Termination of this Letter of Intent shall not relieve any of the Parties from the obligations imposed by Section 6 and Section 9 above, with respect to Standstill, Non-Circumvention and/or Proprietary Information exchanged between the Parties, or as it relates to the terms, conditions, plans or discussions regarding the Project.

11. **ACCEPTANCE** - If Principals are in agreement with the objectives indicated in Section 2 and the conditions indicated in Section 3 of this Letter of Intent and the terms and conditions contained herein, please sign the RETURN COPY of this Letter of Intent and

**LTT002159**
**Confidential**

return it to SDP. The terms of this Proposal are valid until 5:00 PM, Central Time, September 17, 2009 and may be accepted as indicated above.

We look forward to our future meetings and the success of the Project which we can accomplish through our mutual efforts.

Sincerely,

**SURGICAL DEVELOPMENT PARTNERS, LLC**

G. Edward Alexander, President and CEO

**Accepted this** \_\_\_ **day of September, 2009 and effective September** \_\_\_\_**, 2009.**

Robert F. Berry

R. Keith McDonald

# APP. 2

Notice sent: Final  Interlocutory  None
Disp Parties: DF-3, DF-5
Disp code: CVD / CLS 4690
Redact pgs:
Judge SAY  Clerk SWG

Filed in The District Court
of Travis County, Texas

JUL 17 2014 SG

At ___9:OC___ A M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, LLC n/k/a LAKE TRAVIS SPECIALTY HOSPITAL, LLC, | § § § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| V. | § § | |
| LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA & DIAMOND, LLC, BRENNAN, MANNA & DIAMOND, P.L. AND FRANK T. SOSSI | § § § § § § § § § | 345TH JUDICIAL DISTRICT |
| Defendants. | § § § | TRAVIS COUNTY, TEXAS |

---

## ORDER

---

CAME ON TO BE HEARD, this 19th day of June, 2014, Defendants Brennan, Manna & Diamond, LLC and Frank T. Sossi's *Amended Traditional and No-Evidence Motion for Summary Judgment* ("Motion"), and the Court, after reviewing the Motion, any written responses and replies thereto, and having heard oral argument from counsel for the parties, hereby **ADJUDGES, DECREES, AND ORDERS AS FOLLOWS:**

(A)  The Motion is **GRANTED** in respect to the misappropriation of trade secrets claim and negligent misrepresentation claim alleged by Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC against Defendants Brennan, Manna &

Diamond, LLC and Frank T. Sossi, and those two claims are **DISMISSED WITH PREJUDICE.**

**(B)** In all other respects, the Motion is **DENIED.**

SIGNED this ___16ᵗʰ___ day of ___Jul___, 2014.

_____
PRESIDING JUDGE

AGREED AS TO FORM:

_____
S. Abraham Kuczaj, III
Attorney for Plaintiff Lake Travis
Transitional LTCH, LLC n/k/a
Lake Travis Specialty Hospital LLC

_____
B. Ryan Fellman
Attorney for Defendants Brennan,
Manna & Diamond, LLC and
Frank T. Sossi

# APP. 3

Notice sent:  Final  Interlocutory  None

Disp Parties:_____

Disp code:  CVD / CLS _____

Redact pgs:_____

Judge  SAY ____ Clerk SWG

Filed in The District Court
of Travis County, Texas

JUL 16 2014 **BH**

At_____4:00P____M.
Amalia Rodriguez-Mendoza, Clerk

NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, LLC n/k/a LAKE TRAVIS SPECIALTY HOSPITAL, LLC, | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA & DIAMOND, LLC, BRENNAN, MANNA & DIAMOND, P.L., AND FRANK T. SOSSI | § § § § § § § § § | |
| Defendants. | § § | 345th JUDICIAL DISTRICT |

## ORDER

Upon consideration of Defendant Lakeway Regional Medical Center, LLC's ("LRMC") Amended Traditional and No-Evidence Motion for Summary Judgment and Brief in Support and Surgical Development Partners, LLC's ("SDP") Amended Traditional and No-Evidence Motion for Summary Judgment (the "Motions"), the Responses thereto, the evidence, the pleadings, and the arguments of counsel, the Court hereby **ORDERS** as follows:

1.      Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Plaintiff") alleges that LRMC and SDP breached the Letter of Intent dated September 15, 2009. LRMC and SDP moved for summary judgment on Plaintiff's breach of contract claim. The Court hereby **GRANTS** the Motions only with respect to Plaintiff's claim that LRMC and SDP breached Section 2 of the Letter of Intent.

2.      Plaintiff also alleged that LRMC and SDP misappropriated Plaintiff's alleged trade secrets. LRMC and SDP moved for summary judgment on Plaintiff's trade secret

misappropriation claim.  The Court hereby **GRANTS** the Motions with respect to Plaintiff's trade secret misappropriation claim.

3.      Plaintiff has also pleaded a claim for negligent misrepresentation against LRMC and SDP.  LRMC and SDP moved for summary judgment on Plaintiff's negligent misrepresentation claim.  The Court hereby **GRANTS** the Motions only with respect to the following alleged negligent misrepresentations: (i) Plaintiff's allegation that LRMC and SDP misrepresented that they had destroyed or deleted all of Plaintiff's alleged confidential, proprietary, and/or trade secret information; (ii) Plaintiff's allegation that LRMC and SDP negligently misrepresented that they were making best efforts to satisfy the conditions under the Letter of Intent; and (iii) Plaintiff's allegation that LRMC and SDP negligently misrepresented that they would not use information disclosed during the negotiations for any purpose other than evaluating the project described in the Letter of Intent.

4.      The Court hereby **DENIES** the Motions in all other respects.

SO ORDERED this 16th day of July, 2014.

_____
Judge Presiding

APP. 4

Notice sent: Final Interlocutory None
Disp Parties:_____
Disp code: CVD / CLS _____
Redact pgs:_____
Judge SAY   Clerk SWG

DC        BK14196 PG114

Filed in The District Court
of Travis County, Texas

ES JUL 07 2014 SG
At_____94 7g___M.
Amalia Rodriguez-Mendoza, Clerk

NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, LLC n/k/a LAKE TRAVIS SPECIALTY HOSPITAL, LLC, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA & DIAMOND, LLC, BRENNAN, MANNA & DIAMOND, P.L., AND FRANK T. SOSSI | § § § § § § § § § | |
| Defendants. | § § | 345th JUDICIAL DISTRICT |

Filed in The District Court
of Travis County, Texas

ES JUL 07 2014
At_____M.
Amalia Rodriguez-Mendoza, Clerk

## ORDER

Upon consideration of *Defendants' Objections to Evidence Contained in Plaintiff's Appendix In Support of Plaintiff's Responses to Defendants' Motions for Summary Judgment* (the "Objections"), any response thereto, the evidence, the pleadings, and arguments of counsel, the Court hereby **ORDERS** follows:

The Court **Sustains** Objection No. 1. to Exh 33, except for those Bates numbered documents actually referenced in plaintiff's response.

The Court **Sustains** Objection No. 2.

The Court **Overrules** Objection No. 3. Defendants did not identify which of the 189 Bates labeled documents.

The Court **Sustains** Objection No. 4.

The Court **Sustains** Objection No. 5.

SO ORDERED this 7th day of Jul, 2014.

_____
Judge Presiding

53596234.1

- 1 -

12261

# APP. 5

ORIGINAL

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, | § | IN THE DISTRICT COURT OF |
| LLC n/k/a LAKE TRAVIS SPECIALTY | § | |
| HOSPITAL, LLC, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, T E X A S |
| | § | |
| LAKEWAY REGIONAL MEDICAL | § | |
| CENTER, LLC AND SURGICAL | § | |
| DEVELOPMENT PARTNERS, LLC | § | 345TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your cell phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.        Do not let bias, prejudice or sympathy play any part in your decision.

---

Charge of the Court
Page 1 Filed in The District Court
of Travis County, Texas

Filed in The District Court
of Travis County, Texas

AUG 2 7 2014 RT
At_____1:50 P_____M.
Amalia Rodriguez-Mendoza, Clerk

AUG 2 8 2014 RT
At_____12:20 P_____M.
Amalia Rodriguez-Mendoza, Clerk

12997

2.     Base your answers only on what was presented in court and on the law that is in these instructions and questions.  Do not consider or discuss any evidence that was not presented in the courtroom.

3.     You are to make up your own minds about the facts.  You are the sole judges of the credibility of the witnesses and the weight to give their testimony.  But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important.  No one should say that any question or answer is not important.

6.     Answer "Yes" or "No" to all questions unless you are told otherwise.  A "Yes" answer must be based on a preponderance of the evidence unless you are told otherwise.  Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case.  If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence.  For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision.  Answer each question carefully without considering who will win.  Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount.  Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.    Do not trade your answers.  For example, do not say, "I will answer this question your way if you answer another question my way."

11.    Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors.  The same 10 jurors must agree on every answer.  Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

Charge of the Court
Page 2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Definitions

"LTT" means Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC.

"LRMC" means Lakeway Regional Medical Center, LLC.

"SDP" means Surgical Development Partners, LLC.

"Letter of Intent" means the letter agreement between SDP and LTT dated September 15, 2009.

---

Charge of the Court
Page 3

## **QUESTION NO. 1:**

Did SDP and/or LRMC fail to comply with the Letter of Intent?

Answer "Yes" or "No" for each of the following:

a.   LRMC   _yes_

b.   SDP   _yes_

**Charge of the Court**
**Page 4**

If you answered "Yes" to any subpart of Question No. 1 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 2:

Was LRMC's and SDP's failure to comply excused?

Failure to comply by LRMC and/or SDP is excused by LTT's previous failure to comply with a material obligation of the Letter of Intent.

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which it reasonably expected;

2. the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Failure to comply by LRMC and/or SDP is excused if the following circumstances occurred:

1. LTT

   a. by words or conduct made a false representation or concealed material facts, and

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. with the intention that LRMC and/or SDP would rely on the false representation or concealment in acting or deciding not to act; and

Charge of the Court
Page 5

2.  LRMC and/or SDP

a.  did not know and had no means of knowing the real facts; and

b.  relied to its detriment on the false representation or concealment of material facts.

Answer "Yes" or "No" for each of the following:

a.  LRMC  *No*

b.  SDP  *No*

## QUESTION NO. 3:

Did LRMC and/or SDP make a negligent misrepresentation on which LTT justifiably relied?

Negligent misrepresentation occurs when—

1.  a party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest, and

2.  the representation supplies false information for the guidance of others in their business, and

3.  the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Answer "Yes" or "No" for each of the following:

a.  LRMC   _No_

b.  SDP   _No_

If you answered "Yes" to any subpart of Question No. 3 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 4:

By what date should LTT, in the exercise of reasonable diligence, have discovered the negligent misrepresentation of LRMC and/or SDP?

Answer with a date in the blank below for each of the following:

a.     LRMC     _____

b.     SDP     _____

**Charge of the Court**
**Page 8**

If you answered "Yes" to both subparts of Question No. 3 then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found cause or contributed to cause LTT's damages. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measure by the number of acts or omissions found.

## QUESTION NO. 5:

For each party you found caused or contributed to cause the damages to LTT, find the percentage of responsibility attributable to each:

a.     LRMC    _____ %

b.     SDP      _____ %

      Total    ___100___ %

**Charge of the Court**
**Page 9**

If you answered "Yes" to any subpart of Question No. 1, and "No" to the corresponding subpart of Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that resulted from LRMC and/or SDP's failure to comply with the Letter of Intent?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1.  The loss in fair market value of LTT's confidential information that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

    Answer: __$790,000__

2.  LTT's lost profits that were a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

    Answer: __0__

3.  The loss in fair market value of LTT that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

    Answer: __$7,900,000__

Charge of the Court
Page 10

If you answered "Yes" to any subpart of Question No. 3, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 7:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that were proximately caused by the negligent misrepresentation?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not add any amount for interest on past damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1.  The difference, if any, between the value of what LTT received in the transaction and the value given.

    Answer: _____

2.  The economic loss, if any, LTT otherwise suffered in the past as a consequence of LTT's reliance on the misrepresentation.

    Answer: _____

**Charge of the Court**
**Page 11**

**Presiding Juror:**

     1.     When you go into the jury room to answer these questions, the first thing you will need to do is choose a presiding juror.

     2.     The presiding juror has these duties:

a.  Have the complete charge read aloud if it will be helpful to your deliberations.

b.  Preside over your deliberations. This means the presiding juror will manage the discussions and see that you follow these instructions.

c.  Give written questions or comments to the bailiff who will give them to the judge.

d.  Write down the answers you agree on.

e.  Get the signatures for the verdict certificate.

f.  Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instruction for Signing the Verdict Certificate:**

     1.     You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another.

     2.     If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

     3.     All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

JUDGE PRESIDING    8-27-14

Charge of the Court
Page 12

# VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror

___✓___ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| SIGNATURE | PRINTED NAME |
|---|---|
| 1. *Victoria Wiesen* | *Victoria Wiesen* |
| 2. *Eileen McGinnis* | Eileen McGinnis |
| 3. *Deborah Pesek* | Deborah J. Pesek |
| 4. | Sabrina Lenee Hardcastle |
| 5. *Robert D Blackard III* | ROBERT D BLACKARD, III |
| 6. *M. Thomson* | Meghan Thomson |
| 7. | Scott Hambleton |
| 8. *Peri King* | Peri S. King |
| 9. *Amanda Mullins* | Amanda Mullins |
| 10. | Seyda Okcu |
| 11. | Iuliia Lepiz |
| 12. | |

Charge of the Court
Page 13

# APP. 6

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, | § | IN THE DISTRICT COURT OF |
| LLC n/k/a LAKE TRAVIS SPECIALTY | § | |
| HOSPITAL, LLC, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| LAKEWAY REGIONAL MEDICAL | § | |
| CENTER, LLC, SURGICAL | § | |
| DEVELOPMENT PARTNERS, LLC, | § | |
| BRENNAN, MANNA & DIAMOND, LLC, | § | |
| AND FRANK T. SOSSI, | § | 345th JUDICIAL DISTRICT |

## JUDGMENT

On August 11, 2014, this cause came on to be heard. Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Plaintiff" or "LTT"), appeared in person and by attorney of record and announced ready for trial. Defendant Lakeway Regional Medical Center, LLC ("LRMC") and Defendant Surgical Development Partners, LLC ("SDP") (collectively, "Defendants" and each a "Defendant"), appeared in person and by their attorney of record and announced ready for trial. A jury having been previously demanded, a jury was duly empanelled and the case proceeded to trial.

The jury heard the witnesses and the presentation of evidence. At the conclusion of the evidence, the Court submitted the questions of fact in the case to the jury. The charge of the court and the verdict of the jury are incorporated by reference herein for all purposes. On August 28, 2014, the jury returned a verdict to the Court. Because it appears to the Court that the verdict of the jury was for Plaintiff LTT and against

1138876

Defendants SDP and LRMC, judgment should be rendered on the verdict in favor of the Plaintiff LTT and against the Defendants SDP and LRMC.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT, in respect to its breach of contract claim, have and recover actual, past damages from Defendants SDP and LRMC, jointly and severally, in the amount of $7,900,000.00, as well as prejudgment interest on that amount at an annual rate of five percent (5.0%). As of October 13, 2014, prejudgment interest on that amount, calculated as simple interest based on the date this case was filed on April 3, 2012, totals $998,863.01, which amount shall increase by $1,082.19 per day until the date this judgment is signed.

The Court finds that the parties have stipulated that the amount of reasonable attorney fees incurred by Plaintiff LTT in the prosecution of its breach of contract claim against Defendants SDP and LRMC is $2,000,000.00. IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have and recover from Defendants SDP and LRMC, jointly and severally, reasonable attorneys' fees incurred in the prosecution of LTT's breach of contract claim in the sum of $2,000,000.00 pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of court incurred by Plaintiff LTT in this matter are adjudged against and shall be recovered, jointly and severally, from Defendants SDP and LRMC.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have judgment against Defendants SDP and LRMC, and that the total amount of

2

1138876

judgment for Plaintiff LTT against Defendants SDP and LRMC, jointly and severally, shall be as follows: actual damages in the sum of $7,900,000.00; plus prejudgment interest on that sum as set forth above; plus attorneys' fees in the stipulated amount of $2,000,000.00; plus costs of court; plus post-judgment interest on the sum total of each of the foregoing, at an annual rate of five percent (5.0%), compounded annually, from the date this judgment is rendered until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all writs and processes for the enforcement and collection of this judgment or the costs of court shall issue as necessary.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the relief specified above is hereby granted and, as to all parties and issues in this case, all relief not specifically granted herein is expressly denied. This judgment is final, disposes of all claims and parties, and is appealable.

SIGNED on October ___16th___, 2014.

_____
HONORABLE LORA J. LIVINGSTON
PRESIDING JUDGE

3

1138876

# APP. 7

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, LLC n/k/a LAKE TRAVIS SPECIALTY HOSPITAL, LLC, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA & DIAMOND, LLC, BRENNAN, MANNA & DIAMOND, P.L., AND FRANK T. SOSSI, | § § § § § § § § § | |
| Defendants. | § | 345th JUDICIAL DISTRICT |

## DECLARATION OF ROBERT BERRY

1. My name is Robert Berry. I am over twenty-one years of age, have never been convicted of a felony or misdemeanor involving moral turpitude, and I am otherwise competent and qualified to make this declaration. I am Chief Executive Officer and Managing Member of Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC, ("Plaintiff" or "LTT") in the above-styled litigation. This declaration is filed pursuant to Texas Civil Practice & Remedies Code § 132.001 in support of Plaintiff's Responses in Opposition to Defendant Lakeway Regional Medical Center, LLC's Amended Traditional and No-Evidence Motion for Summary Judgment and Brief in Support; Defendant Surgical Development Partners, LLC's Amended Traditional and No-Evidence Motion for Summary Judgment and Brief in Support; and Defendant

1074813

Brennan, Manna & Diamond, LLC, Brennan, Manna & Diamond, P.L., and Frank T. Sossi's Amended Traditional and No Evidence Motion for Summary Judgment. In this Affidavit, I refer to Defendants Lakeway Regional Medical Center, LLC, Surgical Development Partners, LLC, Brennan, Manna & Diamond, LLC, Brennan, Manna & Diamond, P.L., and Frank T. Sossi collectively as "Defendants." I have personal knowledge of the facts asserted herein, which are true and correct.

2.      On or about April 29, 2009, Surgical Development Partners, LLC ("SDP") and Lakeway Regional Medical Center, LLC ("LRMC") approached LTT about acquiring the Lake Travis Hospital facility to serve as the initial general acute care campus for LRMC's hospital. At the time, LTT had a significant head start on construction, and was reluctant to share any of its confidential information with the developers of a competing general acute care facility. LTT was just months away from being over 80% complete, while LRMC was still just a lot. In order to allow the parties to discuss the possible acquisition of LTT's facility, SDP and LTT executed a Confidentiality Agreement dated May 11, 2009. A true and correct copy of the Confidentiality Agreement is attached as **Tab A**.

3.      In late May 2009, LTT informed LRMC and SDP that it wished to publicly announce LTT's plans to operate as a general acute care facility. LRMC and SDP asked LTT to not make the announcement and to give LRMC and SDP more time to complete their due diligence related to their potential acquisition of LTT's facility.

2

1074813

4.     On September 15, 2009, LTT and LRMC and SDP executed a Letter of Intent ("LOI"). The LOI obligated LRMC and SDP to keep confidential the information received in the course of evaluating the acquisition of the LTT facility (the "Project"). A true and correct copy of the LOI is attached as **Tab B**. Eddie Alexander, SDP's CEO, directed me to provide all due diligence information relating to the Project to him. LTT intended SDP to be a party to the LOI and to be bound by the terms of the LOI. When negotiating the terms of the Confidentiality Agreement and LOI, Defendants represented that they would keep all information provided in connection with the Lake Travis facility confidential and not use it for any purpose, other than to evaluate the Project. Both LTT and its Principals relied upon that promise to enter the agreements and provided its confidential, proprietary and/or trade secret information to Defendants including, but not limited to the information discussed below.

5.     LTT's confidential, proprietary, and trade secret information was provided to Defendants during the course of their project review. Some of the information was provided after SDP executed the Confidentiality Agreement. The majority of the information was provided after the LOI was executed. Some of the information was conveyed to Defendants verbally, through meetings, telephone calls, tours of the site, etc. To the extent the information is contained in written documents, it has been compiled into a "Project File" and produced to each of the defendants in this matter. The Bates range of the Project File is LTT 007875-LTT 009907. LTT owned the confidential, proprietary and trade secret information contained in the Project File. As the sole owners

3

1074813

7606

of LTT, Keith McDonald and I had an ownership interest in the information as well, and were authorized to disclose it pursuant to the LOI on behalf of LTT.

6. In my role as Managing Member and CEO of LTT, I am familiar with and have personal knowledge of LTT's confidential, proprietary, and trade secret information, including the documents contained in the "Project File," which include: a deal subfile; correspondence; contracts; drawings and specifications; financial information and business plans; and other miscellaneous information pertaining to the Project.

7. I have reviewed each of the documents in the Project File. The Project File contains information that LTT used in its business that provided LTT with an advantage over competitors who did not know or use it. Much of the information in the Project File is or reflects confidential and proprietary information that provided LTT with a competitive advantage, and LTT considered this information a trade secret. The trade secret information in the Project File includes, but is not limited to: architectural plans; program design and operations; financial information; hospital organization; mission; staff recruitment and retention; physician support; sources and uses of funds and other "cost based" information; preliminary financial feasibility and other information about projected revenues and costs for the initial operation of Lake Travis Hospital; current state of construction; and preliminary financial feasibility ratios and other information about projected key operational ratios of Lake Travis Hospital. Other information in the Project File contains some information that may, by itself, be in the public domain;

4

7607

however, when used in unique combination with other information in the Project File, it provides LTT with a competitive advantage as well. In addition, the Project File contains certain confidential modified architectural plans that were not, at the time they were provided to defendants, on file with the City of Lakeway or with any other public entity. The trade secrets contained in, reflected in, and comprising the Project File were provided to Defendants during the course of negotiating with SDP and LRMC the acquisition of LTT's facility as LRMC's initial general acute care campus. In addition, LTT provided some of this information to Defendants verbally during the project review.

8. LTT owned the trade secrets contained in the Project File and used them in its business. These trade secrets in the Project File were not generally known or readily available to the public. LTT took reasonable steps to preserve the confidential and secret nature of its trade secrets. For example, it was LTT's practice to require parties seeking LTT's confidential information and trade secrets to agree to keep the information confidential. LTT secured agreements to keep LTT's information confidential from, among others: its landlord, HCN Interra; the joint venturers who formed the LTT's landlord, HealthCare REIT and Interra; the facilities' architect, MEDesign Architecture; and the contractor who built the facility, Drymalla – Beckford Construction Co., LLC. LTT also secured confidentiality agreements from SDP and LRMC. I was personally involved in securing each of these agreements to keep LTT's information confidential. It was my understanding and belief that each of the parties would keep information developed during SDP's and LRMC's review process confidential. For example,

5

1074813

7608

attached at **Tab C** is a true and correct copy of an email from Bill Hurd at HCN Interra to Eddie Alexander and Ed Bivins at SDP, Bob Becktell at Drymalla – Beckford Construction Co., LLC, and others involved in the discussions relating to the Project, informing everyone that "This information is for the project review, please keep it confidential along with all of the information generated during this review process." No party to the email contested Bill Hurd's understanding that all the information generated during the review process was to be kept confidential.

9.     After SDP and LRMC terminated the transaction in late March 2010, LTT continued to require interested parties to agree to keep LTT's information confidential. I cannot recall any instance in which LTT's trade secrets were disclosed, voluntarily or otherwise, to a third party unless the third party had committed either orally or in writing to keep the information confidential.

10.     Because the trade secret comprised of the body of knowledge illustrated by the Project File is reflected in its unique combination, it is not discoverable by inspection. The same is true for the vast majority of its constituent parts. LTT took measures to limit access to this information, both externally by requiring recipients to agree to keep the information confidential, and internally by limiting employee access to the information.

11.     The trade secrets contained in the Project File are valuable to LTT. LTT spent a great deal of time, energy, and money developing the information. The Principals of LTT personally expended more than 12,000 man hours over 6 years in the development of LTT and more than $2,650,000 in personal funds, including over

6

$1,031,000 in development staff salaries. The information would be extremely difficult to duplicate, if it is possible at all.

12. The hospital facility was LTT's primary asset. The transaction contemplated by the LOI, which included reimbursement for certain development costs and other expenses, was for all practical purposes the sale of LTT's business. It is my understanding that LTT, LRMC, and SDP each had an economic interest in the deal being negotiated to acquire the LTT facility.

13. At all relevant times, including from the beginning of 2009 up to the present day, I have been the Chief Executive Officer of LTT as well as its Managing Member. As an officer in a management position at LTT, I am familiar with and have personal knowledge of the value of LTT and its assets. For the same reason, I am familiar with and have personal knowledge of the lost net income from third parties that LTT would have, with reasonably certainty, been able to earn but for defendants' wrongful conduct. In reliance on the misrepresentations made by SDP and the other defendants, LTT forewent the opportunity to earn this net income from third parties and was, instead, induced to delay its completion and beginning of operations as the first acute care facility in Lakeway, Texas.

14. In my role as a managing officer of LTT, I compiled a detailed pro forma that projected LTT's net income. The pro forma is based on objective, detailed facts and data, taking into account the experience of LTT's management, as well as the historical performance of other hospital facilities operated and/or administered by LTT's

7

management. Among other things, the objective facts and figures utilized Federal rates for Medicare reimbursement, adjusted to the region's labor specific rate and utilizing case mix index developed through the analysis of numerous physician interviews and profiles compiled to provide an objective projection of the both the case mix index and projected occupancy rate with reasonable certainty The pro forma utilized historic payment rates for Medicaid, and current per diem rates negotiated by commercial carriers in the market. With respect to outpatient revenue, the pro forma utilized projections as quoted from the companies contracting to provide those services, which included, for example, imaging and emergency care. Expenses were projected based on third party surveys, vendor quotes, contracts, and other objective data. This pro forma was created long before this lawsuit was filed, and was used by LTT in its business. In fact, before this lawsuit was filed, the pro forma was supplied, in confidence, to LTT's landlord, who vetted the pro forma as part of its own business dealings with LTT. Utilizing the objective facts and data that went into the detailed pro forma, and based on my familiarity with and personal knowledge of these objective facts and data and the development of LTT, as LTT's managing officer, LTT suffered, with reasonable certainty, approximately $34.5 million in damages relating to lost net income from business opportunities with third parties in reliance on SDP and the other defendants' misrepresentations.

15. In addition, in reliance on the misrepresentations made by SDP and the other defendants, LTT provided its valuable trade secret Proprietary Information to SDP and the other defendants. As a managing officer of LTT, I am familiar with and have

8

1074813

7611

personal knowledge of the trade secret information that was provided in reliance on the misrepresentations at issue, and the fair market value of that information at the time of the misappropriation by SDP and the other defendants is approximately $7.9 million.

To determine the market value of LTT's confidential, proprietary and trade secret information, I considered the price that a willing buyer would pay to a willing seller for the information, and then reduced that amount by the reduction in the value of the information resulting from LTT's reliance on SDP and the other defendants' misrepresentations. Based on my personal knowledge of and familiarity with the negotiations and discussions between LTT, on the one hand, and SDP and the other defendants, on the other hand, which is additionally supported by my review of the publicly filed documents in this matter, including communications from HUD to defendants raising questions and concerns about competition in the Lakeway area and evidence suggesting uncertainty about whether defendants could get other sources of funding, and further based on my personal knowledge and familiarity with the value and importance LTT placed on its trade secrets and its reluctance to disclose them to a nearby competitor, at the time of the misappropriation, the fair market value of LTT's confidential, proprietary, and trade secret information would conservatively be at least the consideration of $7.9 million contemplated by the LOI, if not more. As a result of LTT's reliance on the misrepresentations, taking into account, among other things, the resulting changes in the parties' competitive posture and the negative impact that has had on LTT's ability to attract investors, the value of LTT's confidential, proprietary, and

9

trade secret information declined in fair market value to nearly zero, making the loss in market value of this information at least $7.9 million. This reduction in fair market value is conservative given that, as a result of SDP and the defendants' wrongful conduct, a number of investors decided to not participate in LTT's project because of concerns about LTT's competitive posture with LRMC.

16. I have reviewed the May 10, 2010 email that Frank Sossi sent to HUD regarding LTT. The information that was the subject of Mr. Sossi's email was LTT's confidential, proprietary, and trade secret information described above, specifically, information regarding LTT's current state of construction, zoning, parking, code compliance, operations, staffing, financing, and physician support. This information was not publicly available, was provided to Defendants during the confidential project review process, and was not available through any other source. I did not authorize Defendants to use or disclose the information underlying Defendants' May 10, 2010 email to HUD, nor did I authorize Defendants to use or disclose LTT's confidential, proprietary or trade secret information in any of Defendants' subsequent communications with HUD. At no time did I, Keith McDonald, or anyone acting behalf of LTT consent to Defendants' use or disclosure of LTT's confidential, proprietary and trade secret information except for the limited purpose contained in the LOI.

17. My understanding is that Defendants claim here that LTT's architectural plans were not trade secrets because they were on file with the City of Lakeway. This claim is inaccurate because LTT's trade secret information includes certain modified

10

7613

architectural plans that were not, at the time they were provided to Defendants, on file with the City of Lakeway or with any other public entity. I am aware that Defendants contend that the old, pre-modification architectural plans, two short and general newspaper articles, and a powerpoint presentation with general information that was partially presented at a meeting in Lakeway were publicly available. This information does not form the basis of LTT's claims, other than to the extent it may relate to aspects of LTT's unique compilation trade secrets. I am not aware of any confidential, proprietary and trade secret information that forms the basis of LTT's claims being publicly available before the misappropriation by SDP and the other Defendants.

18. I am aware of no court order to produce LTT's proprietary information before the misappropriation by SDP and the other Defendants took place. At no time has any Defendant informed me or anyone with LTT that there was a court order that would require the disclosure of LTT's Proprietary Information.

19. As an officer of LTT, I have personal knowledge of and am familiar with LTT as an entity, its value, and the loss of market value suffered by LTT as a result of Defendants' conduct. Based on my personal knowledge of LTT, including its assets and liabilities, the status of construction, and physician support, and taking into account the detailed pro forma discussed above and all of the research and analysis that went into it, a conservative valuation of LTT before Defendants' misconduct would have been $13,794,834. I calculated this number by looking at the post-provider number period, first year of financial performance statements as opined by Tom Glass. Based on my personal knowledge of LTT, I agree with this number. I then took total of monthly

11

1074813

7614

EBIDTA for that year and used a fair market multiplier of 3 to identify an initial fair market value, Once I determined that initial fair market value, discounted the major moveable equipment that LTT retained by 60 percent and combined the residiual value with the initial fair market value for a total of $13,794,834. Based on my personal knowledge and familiarity with LTT, this conservatively reflects the price a willing buyer would pay a willing seller for LTT before Defendants' misconduct. As a result of Defendants' misconduct, LTT lost nearly all its fair market value. LTT seeks to recover, as one of its damage models, the loss in $13,794,834 in fair market value caused by Defendants.

20. In the course of discovery after this case was filed, LTT learned that Defendants made numerous misrepresentations to LTT in the course of the transactions at issue that LTT relied on and that caused LTT harm. Those misrepresentations included, among other things, that Defendants were moving forward with closing on the Lake Travis facility; that they was seeking the necessary HUD approvals for the acquisition of the Lake Travis facility; that they would acquire the Lake Travis facility even in the absence of the HUD guaranty; that they were making best efforts to satisfy the conditions under the LOI; that they were negotiating, in good faith, with Health Care REIT for an assignment of the Lease. These misrepresentations all caused LTT, in reliance on the misrepresentations, to forego publicly announcing its plan to open the Lake Travis facility as a general acute care hospital. LTT also relied on the misrepresentations about Defendants provide its confidential, proprietary information and trade secrets, to allow

12

1074813

construction to be delayed during the due diligence process and to later extend the due diligence period. As a result, after Defendants terminated the LOI shortly after securing the HUD guaranty, LTT's construction had been on hold for approximately six months.

21. Once Defendants terminated the LOI in late March 2010, LTT specifically requested that Defendants return all of the "Proprietary Information" provided to it pursuant to the LOI. Despite LTT's demands, Defendants refused to do so. LTT ultimately filed a lawsuit in Oklahoma to secure return of the Proprietary Information. On May 10, 2010 Defendants represented that they had returned or destroyed all of LTT's Proprietary Information. In reliance on Defendants representations, the lawsuit was voluntarily dismissed without prejudice.

22. In late May 2010, when HUD closed on the guaranty in favor of LRMC and to the exclusion of LTT, questions first arose about what may have happened during the HUD application process. In late May, a CEO of another hospital forwarded an email to me in which HUD expressed opinions about LTT's operations, zoning, licensing, and viability. Prior to that email, no one from HUD had ever communicated with LTT. The statements in HUD's email appeared to be conclusions that were incorrectly drawn from specific information that had been confidentially provided to Defendants during the project review. At that point, LTT's counsel sent a request to HUD under the Freedom of Information Act ("FOIA") to determine what information HUD had considered when evaluating whether Lakeway was underserved for the purpose of LRMC's loan application. By December 2010, HUD continued to refuse to provide any documents in

13

7616

response to the request. At that point, LTT was forced to file a federal lawsuit to seek compliance with FOIA. After lengthy litigation, Judge Sam Sparks ordered HUD to produce the responsive documents.

Further Declarant sayeth not."

My name is Robert Berry, my date of birth is _August 14, 1959_ and my address is _16747 Marsch Springs Drive, Round Rock, Tx 78681_

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Williamson County, State of Texas, on the 21st day of May, 2014

_____
ROBERT BERRY

14

1074813

7617

# APP. 8

# Surgical Development Partners, LLC

# AND

# Lake Travis Transitional LTCH, LLC

# CONFIDENTIALITY AGREEMENT

**THIS CONFIDENTIALITY AGREEMENT** ("Agreement") is made this 11th day of May, 2009, to be effective May 11, 2009 by and between Surgical Development Partners, LLC an Ohio limited liability company ("SDP") and Lake Travis Transitional LTCH, LLC, a Texas limited liability company ("LTT ").

## WITNESSETH

WHEREAS, SDP has an interest in a potential development and/or management agreement opportunity as presented by LTT and will have access to, certain Confidential Information regarding these opportunities; and

WHEREAS, LTT is interested in making the above indicated opportunities available to SDP and will allow SDP to have access to, certain Confidential Information regarding LTT's business; and

WHEREAS, SDP and LTT desire to memorialize their understandings regarding SDP's disclosure and use of Confidential Information.

NOW, THEREFORE, In consideration of the foregoing premises in this Agreement, the parties agree as follows:

1. <u>Confidential Information</u>. LTT may furnish SDP with certain confidential, non-public and/or proprietary information concerning a certain Project in Texas (the "Project"). SDP may furnish LTT with proprietary information concerning its business. All information concerning the Project shall be held by SDP in confidence in accordance with this agreement. All business information concerning LTT's business shall be held by SDP in

Exhibit
4
Berry
8/8/13

7619

confidence in accordance with this Agreement. All information concerning the Project and LTT's business shall hereafter be referred to as the "Confidential Information".

2. <u>Use of Confidential Information</u>. The parties hereto agree to use Confidential Information only for informational purposes to evaluate participation in the Project. Both parties agree not to disclose Confidential Information to any other person or entity except upon the written consent of the other party. Both parties agree that, as set forth above, neither it nor its employees, agents, or business or professional associates will disclose or use any Confidential Information in any matter whatsoever.

3. <u>Return of Confidential Information</u>. All Confidential Information is to remain the sole property of each respective party. All Confidential Information furnished in documentary form and any copies thereof shall be returned to each respective party immediately upon its request.

4. <u>Entire Agreement: Invalidity</u>. This agreement contains the full and complete understanding of the parties with respect to the subject matter hereof. It supercedes all prior representations and understandings whether oral or written. In the event that any provision herein is found invalid or unenforceable pursuant to judicial decree or discussion, any such provision or obligation shall be deemed and construed to extend only to the maximum permitted by law and the remainder of this agreement shall remain valid and enforceable according to its terms.

5. <u>Equitable Relief</u>. Because of the unique and proprietary nature of the Confidential Information, it is understood and agreed that remedies at law for breach by a party of its obligations under this agreement will be inadequate and either party shall, in the event of such a breach, be entitled to equitable relief, (including without limitation, injunctive relief and specific performance) without any requirements to post bond as a condition for such relief, in addition to all remedies under this agreement or available at law.

6. <u>Legal Fees</u>. The prevailing party and any action or proceeding brought to enforce the provisions of this agreement shall be entitled to recover its reasonable legal costs and expenses incurred in such action or proceeding, including but not limited to, any legal costs and expenses incurred to enforce any judgments rendered on this agreement. The provision regarding recovery of legal costs shall not be merged into any judgment on this agreement.

7. <u>No Rights</u>. Nothing in this agreement shall give either party any right, title, license, or interest, whatever in or to the Confidential Information (which shall remain at all times the property of each respective party) or in or to any existing patents, know how, inventions or other intellectual property of each respective party.

8. <u>Non-Assignability</u>. The rights and obligations of the parties under this agreement may not be assigned.

7620

9. <u>Amendment and Governing Law</u>. This agreement can only be amended by subsequent written agreement between the parties. This agreement will be governed by the laws of the state of Ohio and the parties agree that the exclusive jurisdiction for any disagreement, dispute, claim, or matter arising hereunder shall be in the courts of the State of Ohio, or the United States located in Summit County, Ohio.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date above written.

**Surgical Development Partners, LLC**


_____

G. Edward Alexander, its President


**LTT**


_____

Robert F. Berry, its Managing Member

7621